Paul SIMMONS, a minor, by his father and next friend, Michael Simmons, and Michael Simmons, individually and in his own right, Plaintiffs,

v.

GIBBS MANUFACTURING CO., a corporation, Defendant.

Civ. A. No. 33246.

United States District Court
N. D. Ohio, E. D.
March 5, 1959.

A. H. Dudnik, S. F. Komito, Cleveland, Ohio, for plaintiffs.

Dan M. Belden, Black, McCuskey, Souers & Arbaugh, Canton, Ohio, for defendant.

WEICK, District Judge.

Plaintiff was a three year old boy who lost the sight of his right eye on November 19, 1955 as a result of its being struck by a part of a toy top which had come apart while he was playing with it in his home.

He originally filed suit in Delaware for personal injuries against the retailer who had sold the top. A summary judgment was there rendered for defendant on the ground that the defect complained of was a latent one for which the seller was not liable. Simmons v. Richardson

Variety Stores, Del.Super.1956, 137 A.2d 747.

The present action, in this Court, is for damages against the Ohio manufacturer of the top and is based on negligence. It was tried to the Court without a jury.

The child's father had purchased two identical toy tops from the retailer in Newport, Delaware. One of the tops was for plaintiff and the other for his six year old brother. It is conceded that the top in question was manufactured by defendant.

Plaintiff's mother testified that the boys had played with the tops every day for the first few days and irregularly thereafter; that she had spun the tops and her husband might have but no one else had done so; that the tops were kept in a toy box when not in use.

She testified that the tops were purchased shortly after Labor Day. She did not remember testifying at a deposition hearing to the effect that the tops had been purchased from three to four months prior to the accident.

She further testified that on the day of the accident the boys were playing in the dining room of their home; that she had wound and spun the top and then handed it to her son Paul who was sitting on the floor; that the top was unwound when she gave it to him; that she was putting dishes on the table when she heard Paul scream and then she turned around and saw the spool, spring, tack, flange and other parts of the top on the floor; that Paul had been holding the top in one hand and winding it with the other before she heard him cry; that Paul said it hurt his eye but he would not let her look at it. He laid down on the couch and she saw a drop of blood on the couch.

Paul testified that he wound the top and tried to make it spin; that he had the top in his hand when something came out and hit him.

He was taken to the hospital where it was ascertained that a muscle in his right eye had been injured; that it was necessary to remove the eye and replace it with an artificial one.

From the evidence thus far adduced the Court would be justified in finding that the top came apart after the little boy had wound and was trying to spin it. The Court could draw an inference that plaintiff was struck in the eye by some part of the top. This is a reasonable inference. It was not necessary for plaintiff to establish the exact part of the top which struck plaintiff in the eye.

There was no direct evidence, however, to prove what caused the top to come apart. Whether it fell apart from natural wear or tear, abuse or a combination of both or from some other cause does not appear.

There was no proof that any of the component parts of the top were defective.

There was no proof of improper workmanship in the construction of the top.

■ In the absence of proof, the Court would have no right to speculate and decide as to which of the speculative causes is the more reasonable.

■ The Court may not infer negligence in the manufacture of the toy merely because an accident happened and plaintiff was injured.

■ The only theory upon which plaintiff could proceed was that the top had been defectively designed. If there was such a defect as to make the top inherently dangerous to children using it in a normal manner, then plaintiff would be entitled to prevail.

The top was made of tin. It had a spindle which projected vertically from its upper surface. A round spool, made of hard wood, through the center of which a cylindrical hole had been drilled, fit on the spindle.

In the hole of the spool is situated a spring, referred to as the torsion spring. A portion of this spring extends out of, and horizontal to, the hole opening, but is contained in a groove in the top of the spool. The end of this extended portion of the spring is formed into an elliptical

shape. A tack, similar to a heavy carpet tack, is driven through this ellipse to fasten the spring to the wooden spool. Also in the spool is a small spring, known as the detent spring. This spring is also contained in a hole drilled in the spool, and is situated approximately 180 degrees around from the tack on the top of the spool. A small metal peg is contained within the detent spring. A metal flange, or cap, with a round hole in its center, is set on top of the spool and held on it by four sets of metal teeth pressed into the wood.

The top was operated by placing the wooden spool on the spindle and turning the spool. When the spool was placed on the spindle a small projection on the bottom of the torsion spring would engage one of several holes in the upper surface of the top and be fixed therein. The winding action of the spool would then tighten the torsion spring, which was not free to turn in its hole, being held stationary by the tack. This would impart force to the torsion spring. The peg in the detent spring serves the function of engaging other holes in the surface of the top and keeps the spool from unwinding itself when it is not held still. After four and a half turns the torsion spring is completely wound and the spool will turn no more. Then, in order to spin the top, the spindle is pushed downwards while the spool is held. This disengages the spool and imparts the force in the torsion spring to the top itself, causing it to spin.

The tin portion of the offending top shows evidence of wear and usage. The paint has been worn down to the metal on the point on which it spins and has been chipped in other places. The end of the spindle has been pushed in. The wood of the upper part of the spool has a small cut. The detent spring has been deformed. The original flange is missing. The mother testified that she had turned over the flange to an attorney.

It has been suggested that the top might have been damaged while in the possession of plaintiff's attorney, but this was not established by the evidence.

In support of the claim that a design defect existed in the top plaintiff called James McElhaney, of Philadelphia, as an expert witness.

McElhaney graduated from Villanova University in 1955 receiving the degree of Bachelor in Mechanical Engineering and is presently attending the University of Pennsylvania on a teaching fellowship. He is also employed by Grayson & Associates, consulting engineers, who specialize in machine design "and at the same time the firm has handled a number of lawsuits, analyzing and criticizing designs." This was Mr. McElhaney's first appearance as a witness.

The witness did not see the top in question until a few days before the trial. His firm, however, had conducted tests on four similar tops manufactured by defendant, two of which they received in the summer of 1958 and two in September. The firm had received the tops from a Philadelphia attorney named Ryan.

McElhaney endeavored to find some explanation as to how this unfortunate accident had occurred. He undertook to theorize that the tack holding the torsion spring in place had, after repeated windings of the top, come loose and released the torsion spring causing it to come out of the spool at the rate of 50 miles an hour, to engage, strike and deform the small detent spring and precipitate said detent spring into plaintiff's eye.

At first McElhaney said these things were possible, but when advised by the Court that the law dealt only in probabilities he then said they were probable. Despite his conclusion, in my judgment, they still remain mere possibilities.

He gave as his opinion that the tack was inadequate to hold the torsion spring in place and that a screw should have been used instead of the tack. He further testified that the metal flange on the top of the spool should have been designed so that it could not come off; that the ellipse of the torsion spring

should have been recessed and held on the inside of the spool.

McElhaney testified on direct examination that the torsion spring, when fully wound, exerted a force of about seven pounds on the tack. On cross-examination, it appeared that he had not taken into account the fact that the ellipse of the spring was located in a groove in the spool and this, he admitted, would absorb some of the force. He had made no calculations as to the amount of absorption. Without this computation the Court could not attach much weight to his figures. There was no evidence as to the number of times the little boy had wound the top before he attempted to spin it. The number of windings would determine the force being exerted on the tack at the time the top came apart.

As to the tack, he further testified "In—perhaps in the average case, the tack will hold sufficiently well, but there is no positive guarantee of this."

There was no evidence that defendant had made any positive or any other kind of guarantee. It is unlikely that the manufacturer of a toy, which sold at retail for 29¢ and at wholesale for one-half of this amount, would want to give a guarantee of anything.

The tack was embedded in the spool which was constructed of hard wood. Clarence Streb, vice president of defendant, testified that in the construction and testing of tops the head of a defective tack had come off. To guard against this eventuality and to retain the spring, upon such a happening, the company designed and installed the metal flange which was embedded in the upper surface of the spool.

McElhaney also testified that the moisture might affect the wood of the spool, but as to this he had made no calculations.

He also testified that if the top was wound and rewound in time it would eventually come apart. He again made no calculations as to the number of windings which would be necessary to dislodge the tack. It would seem to be self-evident even in the absence of expert testimony that in time any mechanical toy no matter how carefully designed and constructed will wear out.

The witness likewise made no calculations as to the force required to pull the tack out of the hard wood.

In any event, the criticism of the expert related only to the design of the top, and not to the materials and workmanship. Thus, the Court is given only a naked opinion that a design defect existed without any evidence of competent testing or calculations to substantiate the opinion.

█ Mr. Streb testified that in the ten-year period during which over 7,500,-000 of these tops had been manufactured and sold no case had come to his attention where the tack had ever come loose and caused injury. This is persuasive evidence that the top was properly designed. Rathbun v. Humphrey Co., 94 Ohio App. 429, 435, 113 N.E.2d 877; Schindley v. Allen-Sherman-Hoff Co., 6 Cir., 1946, 157 F.2d 102. There was no evidence that other manufacturers had designed their tops any differently.

While evidence of this type is not conclusive, it must be considered by the Court along with all the other evidence in the case in determining whether defendant exercised ordinary care. Witherspoon v. Haft, 157 Ohio St. 474, 106 N. E.2d 296; Northwest Airlines, Inc. v. Glenn L. Martin Company, 6 Cir., 224 F.2d 120, 50 A.L.R.2d 882.

It must be remembered that this top had been in use for at least two and one-half months and probably longer. It bears evidence of sufficient usage and handling to wear the paint off the point where it spins, mar its finish and batter down the spindle. The upper part of the wooden spool has been cut. The flange was not produced at the trial. So many things might have happened to the top during the time it was in the exclusive possession of plaintiff prior to his injury for which the defendant would be in no wise responsible.

■ This case is governed by the law of Delaware which is the place where the toy was purchased and the accident happened. It is also · the place where the last act was performed whereby any liability of defendant might attach. Hunter v. Derby · Foods, Inc., 2 Cir., 1940, 110 F.2d 970, 133 A.L.R. 255; 9 Ohio Jur.2d 718.

■■ In Gorman v. Murphy Diesel Co., 3 Terry 149, 42 Del. 149, 29 A.2d 145, the court held:

"2. Generally a contractor, manufacturer or vendor is not liable to third parties having no contractual relations with him for negligence in the construction, manufacture or sale of the articles he handles.

"3. One who sells or delivers an article which he knows to be imminently dangerous to life or limb of another without notice of its qualities is liable to any person who suffers therefrom an injury which might reasonably have been anticipated, regardless of whether there was any contractual relation between the parties, such liability being based on the foreseeability of danger, and knowledge of probable, not possible, danger being an essential element of the liability."

The Ohio law is substantially the same. Wood v. General Electric Co., 159 Ohio St. 273, 112 N.E.2d 8; White Sewing Machine Co. v. Feisel, 28 Ohio App. 152, 162 N.E. 633; Gilbride v. James Leffel & Co., Ohio App., 47 N.E. 2d 1015; Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 166 F.2d 908.

Hurt v. Charles J. Rogers Transportation Co., 164 Ohio St. 329, 130 N.E.2d 820, indicates that the court may draw reasonable inferences from the evidence.

■ While there was no privity between the parties here, nevertheless, the defendant owed a duty to plaintiff to exercise ordinary care in the design and manufacture of the top. This is because the toy would be inherently dangerous to children for whose use it was intended if defective materials or improper workmanship were employed or if the toy had been improperly and negligently designed. In such event the defendant could have foreseen the probability of injury which might result from its negligent acts.

■ On the other hand, the defendant was not an insurer of the safety of the toy. He did not guarantee it would not wear out and would last forever.

It is just as reasonable that plaintiff's injury resulted from causes for which defendant was not liable as from causes for which defendant was liable.

In Breck v. Rollaway Motor Co., 23 Ohio App. 79, 155 N.E. 147, the steering wheel of an automobile came off suddenly and caused an accident. There was no proof as to what caused the steering wheel to come off. The court held that it could not speculate over causes and that the seller of the steering wheel was not liable.

This case was cited with approval by the Court of Appeals. Schindley v. Allen-Sherman-Hoff Co., supra.

In 65 C.J.S. Negligence § 100, p. 632, the author says:

"A manufacturer of a machine which is not inherently and imminently dangerous is not required to exercise more than ordinary care in its construction. Where the article is suitable and safe for the purpose for which it is to be used when sold by the manufacturer, he has discharged his duty, and the fact that the article becomes dangerous by breakage or depreciation while in use does not constitute negligence for which the manufacturer may be held liable."

■ The burden of proof in this case was on the plaintiff to prove negligence of defendant which proximately caused his injury. As has been pointed out, the plaintiff failed to meet this burden. I, therefore, find that defendant was not negligent in any respect which was a proximate cause of plaintiff's injury and that defendant is not liable in this case.

This memorandum may be adopted as findings of fact and conclusions of law. Judgment may be entered for defendant dismissing the complaint.