**VANDERCOOK AND SON, INC.,**
Appellant,

v.

**George F. THORPE, in his own right and for the Use and Benefit of Standard Accident Insurance Company, Appellee.**

No. 19923.

United States Court of Appeals
Fifth Circuit.

Sept. 19, 1963.

John R. Brown, Circuit Judge, dissented.

Francis P. Conroy, II, James C. Rinaman, Jr., Jacksonville, Fla., Harry T. Gray, Jacksonville, Fla., Marks, Gray, Yates, Conroy & Gibbs, Jacksonville, Fla., of counsel, for appellant.

Charles C. Howell, Steven A. Werber, Robert M. Montgomery, Jr., Jacksonville, Fla., for appellee.

Before CAMERON and BROWN, Circuit Judges, and WHITEHURST, District Judge.

WHITEHURST, District Judge.

This action was brought by the plaintiff in a Five Count complaint to recover damages for personal injury which he claimed proximately resulted from the negligence of the defendant. The parties will be referred to here as they were in the trial court.

The First Count alleged that on the day of the accident while plaintiff was engaged in the performance of his duties as an employee of The Florida Publishing Company, he was operating a certain power driven printing press known and described as a Vandercook Universal II Test Press. That press had been manufactured and installed and maintained by the defendant (hereinafter referred to as Vandercook) and sold by it to the Times Union, and Vandercook at all times knew, or reasonably should have known that the press would be operated for the Times Union by employees of it such as Thorpe was, and it was, or it should have been, foreseeable in the exercise of ordinary care that improper functioning of the press would result in injury to the operator thereof. That press was equipped with a roller on which, in the normal operation of the press in the printing of the newspaper, there was attached a sheet of paper of the sort upon which the Times Union was printed; the roller carrying the sheet of paper on its revolving surface moved laterally from the lefthand end of the machine bed or ways of the press to the righthand end, and at that point all movement of the roller stopped so that the operator would have time and opportunity to perform in safety the necessary function of removing from the roller the sheet of paper which in the course of its movements upon and across the bed of the press had been printed.

On July 2, 1959, while Thorpe in operating the press was removing a sheet of paper from the roller of the press, the cylinder suddenly, rapidly and without warning retracted, rather than remaining stationary as it was supposed to do under the control settings and began revolving and moving towards the left-hand end of the machine bed, catching Thorpe's left hand. * * * Thorpe's injuries were the proximate result of the defendant's negligence in so designing its press that the roller did not stop when it reached the righthand end of the machine bed or ways.

The Second Count claimed that plaintiff's injuries were proximately caused by the negligence of the defendant in so constructing the press that the roller did not stop when it reached the righthand end of the machine bed or ways.

The Third Count alleged negligence of the defendant in installing the press.

The Fourth Count alleged defendant's negligence in so maintaining the press that the roller did not stop at the righthand end of the bed or ways.

The Fifth Count alleged that the defendant impliedly warranted that the press was safe for operation and use in the purpose for which it was intended; knew, or reasonably should have known, that the press would be operated by the employees of the Times Union of which Thorpe was one, and impliedly warranted to Thorpe that the press was properly and correctly designed, constructed and installed, and was safe for operation and use by him in the manner in which he was operating and using the press at the time of his injury.

Over the objection of the defendant an additional Count was permitted, claiming negligent failure of the defendant to warn plaintiff of the dangerous propensities or characteristics of the press in that the roller would be likely to retract without warning unless certain adjustments were timely and periodically made.

When the plaintiff rested his case he had established that plaintiff's employer, the Times Union, purchased from the defendant a Vandercook Universal II Test Press. That the press was tested at the factory and found to be functioning properly before shipment. That it was installed by the Times Union in its press room on February 11, 1959. The press was to be used by the plaintiff and the other employees, eight or nine in number, for proof testing etchings of pictures to be used in the newspaper in connection with news stories. The engraver would etch onto a metal plate the picture to be reproduced and would then test his handiwork by the use of the proof press. The machine was so designed that it could be used in three ways, i. e., manual, semi-automatic and automatic accomplished by the proper setting of the controls. It was generally operated by the engravers on a semi-automatic setting, and it was so set at the time of plaintiff's injury. The machine when set for semi-automatic operation was so designed that when the operator would place the plate to be tested on the bed, switch on the electric current (the machine was electrically powered) and press a foot pedal the roller would move from the left end of the press to the right end and stop, remaining stationary until the foot pedal was again pressed and the roller would then return to its former position and stop.

On July 2, 1959, plaintiff while in the course of his work, placed on the bed of the machine an etched plate to be tested, ascertained that the machine was set for semi-automatic operation, properly inked the plate and attached the paper, pressed the pedal causing the cylinder to move over the plate toward the right end of the press, and when plaintiff reached to remove the paper the cylinder, instead of stopping as it was supposed to do and had theretofore done, reversed course pinioning and severely damaging the plaintiff's hand. The plaintiff thus disabled was hospitalized. The defendant was immediately notified of the accident and on July 30, 1959, a service representative of the defendant arrived and

thoroughly examined the offending machine. He was unable to discover the cause of the malfunction. He undertook to induce a malfunction. His effort in this respect was fruitless.

The engraver employees continued to use the machine which thereafter was observed by them to malfunction at unpredictable times. It would, when set for semi-automatic operation, fail to function by not stopping at the right-hand end of the press as it was supposed to do. On some occasions the roller would travel back and forth over the bed several times before stopping, which the operators came to call the yo-yo action.

In January, 1961, the same service representative who had examined the machine shortly after plaintiff's accident, being again in the area on a routine inspection trip, was informed of the continued malfunctioning of the press and again examined it. He was unable to discover any defect in the machine or explain the cause of its erratic behavior.[1] The offending machine ceased its erratic

1. Witness Waldier

"Q. Now, Mr. Waldier, you are familiar I take it, with the Vandercook Universal II test press?
"A. Yes, sir.
"Q. And specifically now the one that the Florida Times-Union has, are you familiar with that one?
"A. Yes, sir.
"Q. How many times have you examined that press?
"A. Twice for the company.
"Q. Twice for the company?
"A. Yes.
"Q. When was the first time that you examined it?
"A. I'm sure it was July 30, 1959. I have it written down.
"Q. Was it your understanding there had been an accident?
"A. Yes.
"Q. At sometime prior to July 30?
"A. Correct.
"Q. When you examined the press did you have any knowledge at the time as to how the press had reacted when the accident occurred?
"A. Only that they said it came back and I couldn't find no reason for it doing so.
"Q. Wait a minute. We will get to that. You did check the press, did you?
"A. Yes, sir.
"Q. Were you able to find a mechanical explanation for it coming back in your checking?
"A. None that I could find, no, sir.
"Q. All right. Is there a semi-automatic or a short—I mean a half stroke?
"A. Half cycle?
"Q. Yes. Is the press supposed to remain at the right-hand end of the bed when the clutch, when you release your foot from the clutch when it is on semi-automatic?
"A. If the lever is up on semi-automatic as you call it. I call it half cycle.

"Q. That would be the lever over on the right-hand side of the machine that says stop or run?
"A. That's right.
"Q. That's right. If it was on stop rather than run—
"A. If it was on stop and you press the foot down on the pedal all the way and release the pedal, it would stop at the front end.
"Q. Then when you press your foot again it should come back?
"A. It should come back, correct.
"Q. Now, Mr. Waldier, you found no mechanical explanation for its failure to stop?
"A. The press worked perfectly when I checked it.
"Q. Did you find anything wrong with the adjustments on the press when you examined it?
"A. At the time I adjusted—at the time I checked it, no, I did not.
"Q. You did not. Did you change anything at that time?
"A. Actually change anything, no. I tried to determine what caused the accident and I could not.
"Q. You didn't change anything; is that right?
"A. I did not change anything.
"Q. Was there anything up on July 30 when you checked the press, did you find anything wrong with the way the press had been maintained or adjusted?
"A. To the best of my knowledge, no.
"Q. It was in proper working order as far as you could discern?
"A. As far as I was concerned that machine was working well.
"Q. From a maintenance standpoint and everything else?
"A. From every standpoint.
"Q. Now, what is the day-to-day or week-to-week or say month-to-month requirements of maintenance—I mean what should a purchaser or a user have to do

**642**

malfunctioning five or six months before the trial,[2] thereafter functioning in normal and proper manner. The press was maintained by The Florida Publishing

to your press with respect to maintenance, one of your newer presses?

"A. Well, the main thing is keep it clean, keep it oiled weekly at least and if any trouble does develop they should notify us or get a competent mechanic.

"Q. And the normal everyday maintenance consists of oiling and lubricating; is that right?

"A. That's true.

"Q. And it is not unusual that you don't have to go in to it and make adjustments or things of that nature?

"A. Well, like in these cams here that we are talking about, if you slow the press down, you have to adjust the cam, but that is an adjustment that the operator is supposed to make.

"Q. You found nothing improper with the adjustments though?

"A. No, sir, I did not.

"Q. Now, the oiling and lubricating of the press, how often should that be done?

"A. On that press once a week would be plenty often.

"Q. Did the press seem to have enough oil when you examined it, the working parts?

"A. To the best of my knowledge.

"Q. I mean you don't have any note that the press needs oil or something like that?

"A. No, I haven't.

"Q. Now, what is the normal life of one of those presses of similar model and design?

"A. Oh, I would say normal useful life is 15 years or better.

"Q. Five months in the life of one of these presses would be relatively short, would it not? It would be almost considered a new press?

"A. Yes, sir.

"Q. Does your company have a guarantee with respect to that press, what it will do or won't do?

"A. What do you mean by guarantee now?

"Q. Do you guarantee the press, as far as you know?

"A. As far as I know we have—if anything goes wrong, we will do our best to fix it.

"Q. Now, did you return to examine the press at a time after July 30th?

"A. I returned on my regular trip. That was almost a year and a half later, I imagine.

"Q. A year and a half later?

"A. Well, it was in January of '61, I believe.

"Q. January of '61. When you checked it that second time was it your understanding that the machine had again malfunctioned in the interval between your last examination?

"A. They had told me that, but again I operated the press. It hadn't done it in a long while according to the people I talked to. I operated the press.

"Q. A long while before your January, 1961 visit, you mean?

"A. Right. And I could find nothing wrong with that press and I assumed they just didn't have the cams set right.

"Q. You had no complaints recently?

"A. Pardon?

"Q. There have been no recent complaints?

"A. No, sir, as far as I was concerned the press was operating all right."

2. Witness engraver Hopkins

"Q. Now, have you ever seen this machine either before or after Mr. Thorpe's injury function any differently when set on semi-automatic than you have just described?

"A. Yes, sir.

"Q. Would you tell us when that was and how many times?

"A. That's a hard question to answer. I would say roughly six months ago I noticed it didn't engage at the far end on semi-automatic and it came back again, and made a full run.

"Q. How many times did it do it on that occasion?

"A. On that occasion one time.

"Q. Have you ever seen it do it more than once?

"A. Yes, sir.

"Q. How many total times have you seen it react in this way that you have described if you can estimate that?

"A. Oh, I'd say 12 or 15. * * *

"Q. Could you tell me how long it has been since you have seen the press operate that way?

"A. Which way?

"Q. The way you have described where it didn't stop.

"A. I'd say four or five months, six months probably."

Witness engraver Gallimore

"Q. Now, have you ever operated the machine, Mr. Gallimore, on semi-automatic setting as you have here described and had the machine operate in a way

Company and not by the defendant as claimed.[3]

In this state of the plaintiff's case the defendant moved for a directed verdict in favor of the defendant on each count of the complaint on several grounds, namely, "that there had been no evidence of any actionable negligence and there was no evidence of any breach of implied warranty." The motion also being addressed to the three negligence counts severally and to the implied warranty count on the ground "that it affirmatively appears that the plaintiff's case totally fails to prove any defective design, totally fails to prove any defective construction, totally fails to prove any breach of implied warranty, and totally fails to prove any knowledge, actual or constructive, of any defect, i. e., such knowledge, any knowledge by Vandercook of defect, thereby creating any obligation to warn. There is no control over the machine by Vandercook. There is no act of omission or commission by Vandercook." Motion was denied.

In construing and applying the Florida Manufacturer's Product Liability Law we said:

> "We think it immaterial whether such liability be considered as arising by implied warranty or under concepts of tort law, because in any event, in absence of any contract cases establishing any higher standard of care, the duty on the party

to be charged remains one of due care." Clarkson v. Hertz Corporation, 5 Cir., 266 F.2d 948.

■ Viewing the plaintiff's proof in its most favorable aspect as we are required to do, we think it totally failed to pinpoint and establish the cause of the malfunction which produced the plaintiff's injury leaving its cause in the realm of mystery and speculation. The machine functioned normally and properly without mishap for a period of about four and one-half months after its installation and maintenance by the plaintiff's employer. The plaintiff was the victim of its first malfunction. It continued to malfunction thereafter at unpredictable times over a period of approximately two years, then resumed its normal and proper functioning up to the time of the trial, a period of about five or six months. The machine being in the exclusive possession, control and maintenance of the plaintiff's employer from the time of its installation for a substantial time before the accident, to-wit: about four and one-half months, precludes the plaintiff from resorting to the *res ipsa loquitur* rule.

In considering the question of requisite proof in Clarkson v. Hertz Corporation, supra, (in a Florida case there cited), we noted the Florida Court's omission to hold that the obvious unfitness of the article in question was suffi-

---

different than how you have just described?
"A. Yes, I have.
"Q. Would you tell me about that? What has it done?
"A. Well, it will go up and then instead of stopping it will come on back.
"Q. Would it give you any warning that it was going to do that?
"A. No, Sir.
"Q. Did you ever get caught in it?
"A. No, Sir. * * *
"Q. Have you seen it do it more than once?
"A. Yes.
"Q. How many times would you estimate you have seen it do it?
"A. It's hard to say, say 50.
"Q. Does it work properly on some occasions?

"A. That's right.
"Q. Have you ever had experience with it working properly and then have one improper run and then further proper runs?
"A. Yes.
"Q. Now, have you seen the cylinder do this lately or how long since you have seen it do it?
"A. Not in the past six months, I am sure."

3. Plaintiff's witness DeFazio
(Foreman of the Engineering Department)

"Q. Now, Mr. DeFazio, who performs the maintenance on that press in your department?
"A. Our maintenance men."

cient to entitle plaintiff to a judgment without proving negligence.

The plaintiff apparently relied on the repetitious malfunctioning of the machine to establish defendant's alleged negligence in its design and construction. He did not undertake to show that there was reasonably available to the defendant, either by ingenuity or otherwise, a design or arrangement reasonably calculated to avoid the malfunction about which he complains. Implicit in the plaintiff's claim is a charge that there was reasonably available to the defendant a safe method to insure the stopping of the roller at the end of the bed when set for semi-automatic operation, which due care required him to adopt, but plaintiff failed to show such a method.

■ We think the burden was on the plaintiff to show that there was something basically wrong with the design or construction of the instrumentality used to control and insure the stopping of the roller of the press at the righthand end of the bed when set for semi-automatic operation and that such fault caused the malfunction. However, plaintiff's proof did not identify the fault. We think the plaintiff was required to identify the cause of the failure of the machine in order to determine the issue of negligence. Mere evidence that the machine malfunctioned and caused the accident is not enough. Simmons v. Gibbs Manufacturing Co., (N.D.Ohio 1959) 170 F.Supp. 818, affirmed 275 F.2d 291 (6 Cir.).

■ The burden was on the plaintiff to prove that the defendant negligently failed to warn of an inherent danger of which it knew or by the exercise of reasonable care should have known. Tampa Drug Company v. Wait, Fla., 103 So.2d 603.

■ Deposition witness, Vandercook, testified that of approximately 1000 machines similar to the one in question here, not one had ever malfunctioned as the plaintiff claimed this one did.[4]

4. "Q. Would you state your name, please?
"A. E. O. Vandercook.
"Q. What is your residence?
"A. 415 Essex Road, Kenilworth, Illinois.
"Q. And you are a permanent resident up here, are you, Mr. Vandercook?
"A. That is right.
"Q. What is your occupation, Mr. Vandercook?
"A. Manufacturer, and President of this firm.
"Q. That is, you are President of the E. O. Vandercook and Son Company?
"A. That is Vandercook and Sons, Inc.
* * *
"Q. When you did not send someone along to install the press, Mr. Vandercook, in those type orders, when you just ship the press direct, are various settings made here?
"A. The presses are always run for an extended period before they are shipped.
"Q. Presumably, then, when it arrives at its designated place, it is ready to go?
"A. That's right.
"Q. Installed and ready to operate?
"A. Yes. * * *
"Q. Now, sir, is there any possibility, or probability, that some of these settings that are made here would be disturbed in transit?
"A. Very unlikely.
"Q. Is this what could be called a precision machine?

"A. It is a precision press. It is not the same class as a machine tool, but it is a precision printing press.
"Q. With fine adjustments?
"A. No. Adjustments are not critical.
* * *
"Q. Is service extra or is that included in the price of the machine? I am speaking of service and maintenance.
"A. What we do on a new machine is to give them at least one free call after it is in when we are in the area.
"Q. And thereafter it would be pursuant to a contract, a service contract, would it?
"A. Well, if it was anything that came under the guarantee, such as a faulty part or something, it would be for a year.
"Q. What does the guarantee include?
"A. Just the usual: Faulty workmanship and material.
"Q. That is a one-year guarantee, is it?
"A. One year.
"Q. Is that a written guarantee?
"A. No. We do not have any written guarantee. It is implied. All manufacturers have about the same thing.
* * * * *
"Q. Now, Mr. Vandercook, is this manual sent along with the machine or under separate cover?
"A. Sent with the machine.
"Q. And then this is, of course, where there is no direct instruction given by

It seems reasonable to conclude that with this history of performance the defendant in the absence of other proof was not obliged to warn of a danger which it had no reason to suspect or foresee and the cause of which the proof did not establish.

The Sixth Count claims that the defendant knew, or should have known, that the roller of the press would be likely to retract without warning unless certain adjustments were timely and periodically made. To support this claim plaintiff offered deposition of the president of the defendant whose testimony we think failed to show any negligent failure to warn.

In addition, the factual posture of the plaintiff's case poses a balance of inferences. The fact that the defendant's proof press functioned normally and satisfactorily for a period of four and one-half months after its installation, and its resumption of such performance after a season of malfunctioning, would as well support an inference of due care in its design and safety as it would support a theory of inadequacy and negligence.

We said in applying Florida law in cases of this kind that:

"Florida law requires that the circumstantial evidence in such a case 'amounts to a preponderance of all

the man from your organization, is that right?

"A. It is always sent, regardless.

"Q. When you do send in a man, does he usually show the personnel of the particular establishment that buys the machine how to operate the machine? Is that part of his job?

"A. That is right.

"Q. I realize this is a difficult question to answer, but is this machine a relatively easy one to operate, or are there several controls a man must be aware of?

"A. It is very simple. * * *

"Q. Is adjusting these cams which do actuate the brake part of the day-to-day maintenance of the machine? You answer that if you know; I am not trying to trip you up. Is that something you have to watch? * * *

"A. No.

"Q. That is something that presumably should be set once and then be all right, is that it?

"A. That's right.

"Q. However, if they are not set right, the braking system will not operate correctly, is that right?

"A. I won't answer. * * *

"Q. Am I to understand, then, that any guarantee you have with regard to this machine is a gentlemen's agreement type thing and not in writing?

"A. It is not in writing.

"Q. Is that guarantee often exercised by purchasers, Mr. Vandercook?

"A. Well, they often come to us within the year for some thing to be corrected. That is quite often, yes * * *

"Q. Are you familar, sir—well, have you watched this machine in operation?

"A. Yes.

"Q. Do you know any of the technicalities about design insofar as this is concerned? Let me ask this question instead: Do you do any of the designing for this company at all?

"A. No.

"Q. Are you an engineer?

"A. No.

"Q. You have no engineering background?

"A. No. * * *

"Q. How many of these machines, approximately, do you have in operation throughout the United States?

"A. Of this general type there is approximately a thousand. * * *

"Q. Now, have you ever had any trouble with the cam grip on any of these machines?

"A. Never. * * *

"Q. Now, again I am going to show you this Sheet No. 191, and I will ask you merely for my information and not to trap you, Mr. Vandercook, a question with regard to that sheet. With regard to those notations, we do not know whether they were put in by your people or not, but assuming they were for the moment, would that be directed to the maintenance man, to 'loosen and tighten the cam'?

"A. I don't know. * * *

"Q. Is it often necessary to correct faulty parts?

"A. Not very often. * * *

"Q. Do you know whether or not the cams which control the stop and go of the circular or semi-circular operation of this machine are adjusted with precision instruments or by eye and feel?

"A. I wouldn't know that right at this time."

reasonable inferences that can be drawn from the circumstances in evidence to the end that the evidence is not reasonably susceptible to equally reasonable inferences.'" Smith v. General Motors Corp., 5 Cir., 227 F.2d 210, 213.

To establish his claim that the defendant was negligent in failing to warn the employees of the Times Union of the danger that the roller would be likely to retract without warning unless certain adjustments were timely and periodically made, the deposition testimony of witnesses Vandercook [5] and Stanley D. Nastek [6] was submitted.

We think this testimony contradicts rather than sustains the plaintiff's claim that failure to make timely and periodical adjustments created a danger of which defendant should have warned as claimed in his Sixth Count.

We think the plaintiff wholly failed to establish the cause of the malfunction of which he complained, therefore, there was no issue of negligence. For this reason we think the motion for directed verdict should have been granted.

The judgment is reversed and the cause remanded with direction to enter Judgment for the defendant.

CAMERON, Circuit Judge (concurring specially).

I concur fully in Judge WHITEHURST's able opinion.

To make out a case here under any theory of liability asserted—tort, warranty or whatever—the plaintiff must show that there was something *wrong* with the press. He must show that it was defective.

Any machine made, no matter how "safe" it be, can and probably will sooner or later malfunction and cause injury if it is improperly used, maintained or cared for. Proof of malfunction and of injury does not, in and of itself, make out a case. Nothing more was shown here.

JOHN R. BROWN, Circuit Judge (dissenting).

Although the question is an extremely close one and I am more than ever reluctant to differ because of the experience-based familiarity of Judge WHITEHURST with Florida law, I think the jury verdict is sustained under Florida law on so-called warranties if not negligence. The extent to which Florida carries the notion of implied fitness is revealed by the recent opinion of Green v. American Tobacco Co., 1963, Fla., 154 So.2d 169, in effect reversing our initial decision, Green v. American Tobacco Co., 5 Cir., 1962, 304 F.2d 70. The press failed to function many times by rolling back when it ought not to. Obviously the jury could find that a press should not do that. The jury could likewise conclude that this was not the result of improper maintenance or repair. A press which unaccountably rolls back without warning is not fit for the job for which it is intended. It was this

5. See Footnote 4.

6. "Q. Where are you employed?
"A. Vandercook and Sons, Inc.
"Q. In what capacity?
"A. Sales representative. * * *
"Q. How long have you been with Vandercook and Sons?
"A. 39 years—like Jack Benny.
"Q. How long have you been servicing or selling in the State of Florida?
"A. About six years.
"Q. Have you done business with the Florida Publishing Company, also known as the Florida Times-Union in Jacksonville?
"A. Yes.

"Q. Have you sold a Vandercook Model 2, or No. 2 test press?
"A. Really that press sold itself. I didn't take the order, if that is what you mean. * * *
"Q. I see. Now, are there certain cams down there at the extreme right of the carriage?
"A. Yes, there are cams.
"Q. Cams which hold or that activate the brake, is that right?
"A. That's right.
"Q. Do those cams require periodic adjustment?
"A. Shouldn't, no.
"Q. Should not, you say?
"A. No."

characteristic which caused Plaintiff's injuries. And for Florida that is enough quite without regard to foreseeability or due care. Certainly the Plaintiff was in the range of persons Florida considers protected by the fitness representation.

I therefore respectfully dissent.