Gaines LASHLEY and Gaines Lashley as next friend of his seven minor children, Plaintiffs,

v.

FORD MOTOR COMPANY, Defendant.

Civ. A. No. 883.

United States District Court,
M. D. Georgia,
Valdosta Division.

Aug. 28, 1972.

---

Seymour Owens, G. Gerald Kunes, Tifton, Ga., for plaintiffs.

Cam U. Young, Valdosta, Ga., for defendant.

BOOTLE, Senior District Judge:

This case is a wrongful death action brought by the husband and seven minor children of the deceased. At the close of the evidence the defendant Ford Motor Company moved the court to direct a verdict in its favor pursuant to Fed.R. Civ.P. 50(a), which motion was overruled by the court. A similar motion by Richardson Ford Company was sustained.

The case was submitted to the jury for consideration, but after considerable deliberation, the jury was unable to ar-

rive at a verdict and was, therefore, discharged. The only remaining defendant, Ford Motor Company, hereinafter referred to as "defendant", within ten days after the jury was discharged, moved for a judgment in accordance with its motion for a directed verdict under Fed.R.Civ.P. 50(b).

Plaintiffs predicate their case against the defendant upon negligence in design, negligence in manufacture and, by amendment adding Count II, implied warranty of merchantability. Plaintiffs' claim for wrongful death under implied warranty has no merit. In the first place, under present Georgia law since the repeal of Ga.Code Ann. § 96–307 and the enactment of the Uniform Commercial Code there is no implied warranty from the manufacturer to one not purchasing directly from the manufacturer. See Whitaker v. Harwell-Kilgore Corp., 424 F.2d 549, 551 (5th Cir. 1970). In the second place, even if warranty existed it would not be available in a case brought under Georgia's wrongful death statute. The Fifth Circuit Court of Appeals in the case of Horne v. Armstrong Products Corp., 416 F.2d 1329 (5th Cir. 1969) held:

"Moreover, if privity had existed, or if the case were covered by § 109A–2–314, the Georgia courts hold that one can recover for an injury under the Uniform Commercial Code or prior law, but cannot recover for wrongful death. In Lovett v. Emory University, 116 Ga.App. 277, 156 S.E. 2d 923, 925 (1967), the court held that Georgia's Wrongful Death Statute, Georgia Code Ann., § 105–1301 (authorizing recovery where death results 'from a crime or from criminal or other negligence') did not comprehend an action for breach of implied warranty except with respect to certain enumerated articles 'intended for human consumption or use, where either knowledge of the defect or negligence by the seller is an essential element.'

"This being the law of Georgia, this Court, in this diversity action, is left with no alternative but to affirm the judgment of the District Court." 416 F.2d at 1330.

Remaining then are plaintiffs' contentions that defendant was guilty of negligence in design and manufacture.

On defendant's motion for a directed verdict, the question is whether the testimony on behalf of the plaintiffs and the reasonable inferences to be drawn therefrom in light most favorable to the plaintiffs, make out a *prima facie* case allowing the plaintiffs to have the jury pass on their alleged cause of action. Gold v. Groves, 182 F.2d 767, 769 (3d Cir. 1950).

Georgia does not follow the strict liability theory of products liability. It was so held in the case of Whitaker v. Harvell-Kilgore Corp., 418 F.2d 1010 (5th Cir. 1969). The court said:

"Strict liability is a comparatively recent legal concept having its origin in the case of Escola v. Coca-Cola Bottling Co., 24 Cal.2d 453, 150 P.2d 436 (1944). Although this new concept has been adopted in several states, it has not expressly been accepted in Georgia. According to the teachings of Putman v. Erie City Manufacturing Co., 338 F.2d 911 (5th Cir. 1964), it now becomes the responsibility of this Court to predict the law by looking to 'all available data; . . . keeping mind that it must choose the rule which it believes the state court, from all that is known about its methods of reaching decisions is likely in the future to adopt.'

"However, Georgia case law is not completely void of all references to strict liability. In Friend v. General Motors Corp. et al., 118 Ga.App. 763, 165 S.E.2d 734 (1968), Judge Pannell in his dissenting opinion stated: 'Georgia is not one of the strict liability states in product liability.' That case was not one which involved the strict liability doctrine, and the statement by Judge Pannell was dictum; however, the dissent was fully concurred in by two other Judges. Al-

though not binding as law, this phrase is a guide to be used in ascertaining the movement of the Georgia law. Plaintiff Whitaker cites Georgia Code Annotated § 105–106 and its amendment as perhaps the best barometer of Georgia's future action. This section allows an action in tort without the necessity of privity; and the Court is convinced that in tort actions privity is not required under Georgia law. However, the element of negligence was not disposed of by this statute, and it still is a requirement in tort suits. In 1968 Professor Hunter Taylor of the University of Georgia School of Law prepared and published in the Georgia Law Review, 'Georgia's New Statutory Liability for Manufacturers: An Inadequate Legislative Response.' This article involved an in-depth study of Georgia Code 105–106, its background and potential effects. The conclusion reached was that Georgia Code 105–106 contains several basic flaws and should be modified before confusion results. Professor Taylor further concluded, 'Because the Georgia courts have failed to implement through the judicial process a strict liability in tort theory of products liability, an approach of many other state courts, legislative action must be taken.

"All of the authorities taken in their totality indicate that Georgia is not a strict tort liability state, nor is it moving in that direction. The District Court correctly ruled on this issue." 418 F.2d at 1017–1018.

Viewing the evidence at the trial most favorably to the plaintiffs, the evidence simply shows that Gaines Lashley was the owner of the car in question, and that it was being operated by his wife when she was killed. It appears that the car was nineteen months old at the time of the accident on March 31, 1969. The car was bought new by Gaines Lashley and had been driven exclusively by him and his wife 24,350 miles. There was no evidence that there had been any prior trouble with the rear axle and, in fact, Gaines Lashley testified that he ". . . didn't have a minute's trouble with the car". (R–249). There were no eye witnesses to the accident. The deceased was found in a field adjacent to the road upon which she was apparently traveling when the incident occurred. The vehicle was found in the same field, and the right rear tire, wheel, braking assembly, backing plate and a portion of the axle were found on the road. The axle had broken in the vicinity of the point where the right rear wheel bearing normally encompasses the axle.

The burden was upon the plaintiffs to prove the negligence on the part of the defendant which proximately caused the injury. The plaintiffs attempted to carry this burden of proving negligence in design by the testimony of Mr. Calvin Cummings, defendant's quality engineer, by eliciting from him evidence that the defendant manufactures another type of axle assembly called a "full floating axle" and that on that particular type of axle assembly the wheel would be contained (R–48) if an axle broke while the vehicle in which it was incorporated was merely traveling down the road. (R–47). This witness testified further that he knows of no American manufactured automobiles that use this type of assembly (R–52), and that it is used on trucks for large load carrying capacities. He further said that it would give a ride to a passenger car like a truck and the rear end would be too heavy and large to embrace this type of assembly. (R–53). He testified that he is not familiar with any passenger type cars anywhere in the world that used this type of axle assembly. (R–52).

■ Construing this evidence most favorably to the plaintiffs, there is no evidence that defendant was guilty of negligence in design. Certainly Ford Motor Company cannot be held negligent as to the design when its design is that used by all other passenger car manufacturers.

■ The witness Calvin Cummings further testified that the vehicle was

carried by commercial carrier from the defendant's plant in Atlanta to Richardson Ford Company in Tifton, Georgia, thus eliminating the possibility of the application of the doctrine of *res ipsa loquitur*. Hospital Authority of St. Marys v. Eason, 222 Ga. 536, 150 S.E.2d 812 (1966); Miller v. Gerber Products Co., 207 Ga. 385, 62 S.E.2d 174 (1950); Hotel Dempsey Co. v. Teel, 128 F.2d 673 (5th Cir. 1942); Chenall v. Palmer Brick Co., 117 Ga. 106, 43 S.E. 443 (1903). Moreover, the car in question had been in the possession of Mr. and Mrs. Lashley for nineteen months.

The plaintiffs then produced their expert witness George William Brooks, whose testimony is set out in pages 277 through 371 of the transcript of evidence. A careful reading of his testimony reveals the following statements or assertions of Mr. Brooks regarding the cause of the mishap:

"Q. All right. Now taking into consideration all of the things that I have just related to you, do you have an opinion as to what caused that axle to break?

"A. Yes.

"Q. What caused it to break, or what is your opinion?

"A. This failure can only be explained for set of circumstances due to a defect in that- this axle. (R–313).

\*　\*　\*　\*　\*　\*

"Q. What in your opinion was the cause of this axle failure?

"A. As I have already stated, I believe there is original steel or manufacturing defect in this axle.

"Q. All right now, is the defect which you have just referred to, is it connected in any way with the area where the axle fractured?

"A. Yes.

"Q. And where with relation to the axle would that defect have been?

"A. It is my opinion that the overall processing of this axle was improper." (R–332).

Keeping in mind that the plaintiffs must do more than prove that a defect existed—they must prove that the defendant was negligent—there is no evidence that the defendant caused the defect because the witness does not state what the defect was. His statements are mere nebulous, naked criticisms unsubstantiated by testimony of what "defect" caused the fracture. Was the axle defective in that it was round instead of square, too long or too short, too big or too small, too hard or too soft?

In the case of Simmons v. Gibbs Mfg. Co., 170 F.Supp. 818, 822 (N.D.Ohio 1959) the court held that a "naked opinion" that a toy top had a design defect was insufficient without any evidence of competent testing or calculations to substantiate the opinion.

Professor Clarence Morris in his article entitled The Role of Expert Testimony In the Trial of Negligence Issues, 26 Texas L. Rev. 1 (1947), discussing the question of expert opinion as to safety, has pointed out that the distinction must be made between a conclusion based on technological facts and mere "unctuous criticism". He points out that the courts are more likely to reject the testimony if it is in the latter category. An expert opinion while very valuable in many situations, nevertheless has a limited weight carrying capacity. "[T]he 'quality' of such testimony must be considered." 1 Frumer and Friedman, Products Liability, § 11.01[1] at 196.3 (1971). "[A]n opinion is no better than the hypothesis or the assumption upon which it is based." International Paper Co. v. United States, 227 F.2d 201, 205 (5th Cir. 1955). "Opinion evidence is only as good as the facts upon which it is based." Washington v. United States, 214 F.2d 33, 43 (9th Cir. 1954). Galloway v. United States, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943), points out that the seventh amendment's guaranty of jury trial

"requires that the jury be allowed to make reasonable inferences from facts

proven in evidence having a reasonable tendency to sustain them. . . ." 319 U.S. at 396, 63 S.Ct. at 1090, 87 L.Ed. at 1474,

and

"permits expert opinion to have the force of fact when based on facts which sustain it." *Id.*

*Galloway* said further that this guaranty

"does not require that experts or the jury be permitted to make inferences from the withholding of crucial facts, favorable in their effects to the party who has the evidence of them in his peculiar knowledge and possession, but elects to keep it so." *Id.*

Thus in *Galloway* it was held that the expert opinion of a medical doctor as to continued insanity would not be allowed the inference that it continued during a period of eight years which were wholly unexplained in the evidence, especially where evidence was available explaining such period but the parties elected not to produce it. The weakness of plaintiffs' expert's opinion is twofold. First, it is disjunctive, uncertain, and speculative:

"A. As I have already stated, I believe there is an original steel *or* manufacturing defect in this axle." (Emphasis added) (R–332).

Since the witness, with his expertise, could not tell which it was, a jury would simply have to speculate. Second, it is only a naked opinion without disclosure of any facts upon which it is based. Plaintiffs' expert witness testified as above and then:

"A. It is my opinion that the overall processing of this axle was improper." (R–332).

As the court said in Simmons v. Gibbs Mfg. Co., *supra*:

"Thus the court is given only a naked opinion that a . . . defect existed without any evidence of competent testing or calculations to substantiate the opinion." 170 F.Supp. at 822.

The failure to supply supporting data was not accidental.

Immediately after the above quoted testimony counsel for the defense pointed out that the witness had not testified what the process was, or that the witness had been to the factory, and thus his conclusion was "not within anything that has been put before him as to what the manufacturing processes were." (R–332). Plaintiffs through their counsel and said witness chose to leave the matter there. Then in closing argument plaintiffs' counsel chided defense counsel for never asking the witness what the "defect" was. Defense counsel replied, in effect, that plaintiffs' counsel had chosen not to make such inquiry and that the witness had not so much as said there was a "bubble" in the axle.

But if we should assume that plaintiffs' expert witness' testimony is sufficient to establish that there was some unknown and unidentified defect in the steel or in the overall manufacturing process, since there is no warranty the plaintiffs must still show negligence on the part of the manufacturer. Frumer and Friedman, *supra*, § 11.01[1] at 196.2. *See* Georgia Railroad & Banking Co. v. Nelms, 83 Ga. 70, 9 S.E. 1049 (1889). And in order to show negligence they are required to identify the cause of the failure. This case is not to be confused with cases involving warranty or with cases arising in jurisdictions applying the doctrine of strict liability. The Fifth Circuit in Vandercook & Son, Inc. v. Thorpe, 322 F.2d 638 (1963), specifically held:

"Viewing the plaintiff's proof in its most favorable aspect as we are required to do, we think it totally failed to pinpoint and establish the cause of the malfunction which produced the plaintiff's injury leaving its cause in the realm of mystery and speculation.

\*　\*　\*　\*　\*　\*

"We think the burden was on the plaintiff to show that there was something basically wrong with the design or construction of the instrumentality used to control and insure the stopping of the roller of the press at the

righthand end of the bed when set for semi-automatic operation and that such fault caused the malfunction. However, plaintiff's proof did not identify the fault. We think the plaintiff was required to identify the cause of the failure of the machine in order to determine the issue of negligence. Mere evidence that the machine malfunctioned and caused the accident is not enough. Simmons v. Gibbs Manufacturing Co., (N.D.Ohio 1959) 170 F.Supp. 818, affirmed 275 F.2d 291 (6 Cir.)." 322 F.2d at 643, 644.

The above quoted holding of the Fifth Circuit is in no way militated against by the fact that on a *warranty* count the plaintiff in *Vandercook* was allowed to recover. *See* Vandercook & Son, Inc. v. Thorpe, 344 F.2d 930 (5th Cir. 1965) and Vandercook & Son, Inc. v. Thorpe, 395 F.2d 104 (5th Cir. 1968). The distinction here controlling is graphically pointed out in Greco v. Bucciconi Engineering Co., 283 F.Supp. 978 (W.D.Pa. 1967), aff'd, 407 F.2d 87 (3d Cir. 1969), where the court said:

"Since the landmark case of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696 (1916), where there was evidence that the wheel which collapsed was constructed of defective wood, successful plaintiffs asserting liability on grounds of negligence have regularly adduced evidence of a specific defect

in the manufacturer's product. Cf. Kuzma v. United States Rubber Co., 323 F.2d 657 (3 Cir. 1963); Trowbridge v. Abrasive Co. of Philadelphia, 190 F.2d 825 (3 Cir. 1951). Absence of such evidence fails to establish a cause of action in negligence. Vandercook and Son, Inc. v. Thorpe, 322 F.2d 638 (5 Cir. 1963), reh. 344 F.2d 930 (5 Cir. 1965).

\*　\*　\*　\*　\*　\*

"In contradistinction to the law of negligence, the law of warranty assigns liability on the basis of the product's lack of fitness. When machinery 'malfunctions', it obviously lacks fitness regardless of the cause of the malfunction. Under the theory of warranty, the 'sin' is the lack of fitness as evidenced by the malfunction itself rather than some specific dereliction by the manufacturer in constructing or designing the machinery." 283 F.Supp. at 981, 982.

It may be that Ford Motor Company was guilty of some negligence somewhere along the line in some step of the manufacturing process but there is not one word of evidence to that effect. So far as the evidence shows the defendant exercised extraordinary care and diligence in every such step. Even if we should assume that there is some defect in the steel there is no evidence that defendant could or should have discovered it.[1]

---

1. The defendant offered substantial and persuasive evidence to negative the charge of negligence in the design and manufacture of the axle and to show that there was in fact no defect. The defendant called James Lee Hubbard, a research scientist with the Engineering Experiment Station at Georgia Tech. Mr. Hubbard's field of endeavor is metallurgy with most of his experience in electronfractography and with electronmicrostophy as his specialty. He engages in the study of fracture faces of metals to determine the cause of failure. Through the use of the electron microscope magnifications in the range of 20,000 times are obtained. Such a magnification permits a high degree of resolution, thus enabling a trained person to differentiate as between various types of metal fractures. The witness testified that through such an examination of a metal sample he is able to determine the mode of failure or the reasons why a piece of metal failed. He testified unequivocally that in his opinion this fracture occurred "by an impact type of failure" (R–398); by impact the witness meant "[a] fast application of stress" (R–478); a cycling stress sometimes causes metal fatigue (R–464); he did not find any evidence of fatigue in this axle (R–464); and he found no defects in this fracture (R–423). Calvin Cummings, another metallurgist, testified that he found no defect in this axle (R–629) and that through an examination of all of the parts

370

Plaintiffs' evidence when tested by basic principles failed to make out a *prima facie* case of negligence on the part of the defendant and, accordingly, this court will enter judgment for the defendant notwithstanding the mistrial.

Let counsel for the defendant prepare an appropriate judgment and submit same after allowing counsel for plaintiffs an appropriate time for suggestions as to form.

involved including the axle, its break, the entire wheel assembly, tire and rim, he concluded that the only way this mishap could occur was through the application of a lateral force to the outboard side of the wheel. He traced and demonstrated the results of that force upon and through all of the involved parts from the tire and rim to the break itself; the tire itself was partly pulled away from the rim and when it closed it grabbed and held grass, vegetation and debris, some of which was still plainly visible at the trial; there is distortion in the brake drum, its front plate and in the spider or center portion of the wheel; the backing plate is distorted; the flanges to which the backing plate bolts and which is welded on to the rear axle housing is bent back; the roller bearing which supports the axle even made slight impressions on the inside of the "race" against which they rotate—and this as the result of a "one shot blow"; and finally the axle was slightly bowed or bent near the break. An expert paint and body man gave it as his opinion from an examination of the car after the mishap in question that the car had undergone previous impact damage to the right side evidenced by a repainting of the entire right front fender, right front door and right rear quarter panel or fender and that these parts had not only been repainted but that before the repainting was done plastic body rebuilding material known as "bondo" had been installed.

The court may not, however, substitute its judgment for any reasonable inference which a jury might draw from plaintiffs' evidence. This memorandum opinion therefore has referred solely to the evidence on behalf of plaintiffs on the issues of defect and negligence.