**ALMAN BROTHERS FARMS & FEED MILL, INC., Plaintiff-Appellee,**

v.

**DIAMOND LABORATORIES, INC., and Southwestern Laboratories, Inc., Defendants-Appellants.**

No. 29085.

United States Court of Appeals, Fifth Circuit.

Jan. 28, 1971.

---

Joe H. Daniel and William Larry Latham, Daniel, Coke, Horton & Bell, Jackson, Miss., for defendants-appellants.

Alfred G. Nichols, Jr., Crisler, Crisler & Nicols, Jackson, Miss., John C. McLaurin, Brandon, Miss., for plaintiff-appellee.

Before TUTTLE, THORNBERRY and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

This products liability suit was originally instituted in the Circuit Court of Rankin County, Mississippi, against appellants Diamond Laboratories, Inc. and its subsidiary, Southwestern Laboratories, Inc. [hereinafter referred to as defendants], for damages sustained by Alman Brothers Farms & Feed Mill, Inc. [plaintiff], and alleged to be the result of the use of defendants' product, an animal vaccine known as "Tissucine". The action was removed to the United States District Court for the Southern District of Mississippi pursuant to 28 U.S.C. § 1441 et seq., and jurisdiction was based on diversity of citizenship.

Defendants' first three specifications of error all relate to the question of sufficiency of the evidence for submission of plaintiff's case to the jury,[1] and thus we shall begin with the recitation of the facts as we have derived them from the record as a whole.

Max and Buck Alman operated a farm acquired in 1966, and were engaged in the business of raising hogs. In November and December of 1966, there was an outbreak of hog cholera involving about eleven of the Alman brothers' hogs. One of the expert witnesses at the trial, Dr. Bedell, testified that he visited the farm on May 24, 1967, and found "some sick pigs," but nothing to cause him to suspect hog cholera. On June 24, 1967, plaintiff had on hand several hundred hogs which had been vaccinated with Franklin serum, and on that day, and over the next few weeks, purchased and kept in separate pens 494 hogs which were vaccinated with a shipment of defendants' vaccine. These 494 hogs, as well as the original group, appeared to be healthy. Defendants' vaccine was administered immediately and according to directions to the new hogs as they were brought in. Beginning on July 7, 1967, part of the new group of 494 hogs became ill and eventually 476 of the 494 succumbed. These hogs would begin to show the symptoms of disease within 12 to 16 days after they had been vaccinated with Tissucine. According to plaintiff, none of the other hogs previously on hand and vaccinated with the Franklin serum became ill or died. The disease was diagnosed primarily to be hog cholera. Plaintiff's expert, Dr. Chadwick, testified that the hog cholera was probably caused by defendants' modified live hog cholera vaccine.

---

1. Defendants' allegations of error, set out in their brief, are as follows:

"1. The Trial Court erred in refusing to grant Appellants' Motion for a Directed Verdict for the reason that Appellee failed to make out a prima facie case against Appellants as alleged in its declaration.

2. The Trial Court erred in refusing to grant Appellants' request for peremptory instruction at the close of the entire case for the reason that Appellee failed to offer any proof that the 'Tissucine' was in a defective condition and unreasonably dangerous.

3. The Trial Court erred in refusing to grant Appellants' request for a judgment Notwithstanding Verdict, or in the alternative a New Trial for the following reasons:

(a) The Verdict was against the overwhelming weight of the evidence.

(b) Prejudicial testimony designed to confuse and mislead the jury was admitted over Appellants' continued objection.

4. The Trial Court erred in instructing the jury for the Appellee on the theory of strict liability."

## I.

### SUFFICIENCY OF THE EVIDENCE

■ Defendants' motions for directed verdict and for judgment notwithstanding a verdict challenged the sufficiency of evidence that "Tissucine" was the proximate cause of the death of plaintiff's hogs. In general, a motion for directed verdict should be granted in two situations: "First, where there is a complete absence of pleading or proof on an issue or issues material to the cause of action or defense. * * * Second, where there are no controverted issues of fact upon which reasonable men could differ." 5 Moore, Federal Practice, ¶ 5002 [1] (2d Ed. 1969). These situations were not present in the instant case. Surely defendants would acknowledge that when their motion for directed verdict was made, reasonable men might have reached different conclusions from the evidence. The standard of review for motions for directed verdict and for judgment notwithstanding a verdict are the same for a trial court and an appellate court. 2B Barron & Holtzoff, Federal Practice and Procedure, § 1074, at p. 375 (Wright Ed. 1961). The evidence and all inferences therefrom must be viewed in the light most favorable to the party against whom the motions are made. Boeing Company v. Shipman, 411 F.2d 365 (5th Cir. 1969); 2B Barron & Holtzoff, *supra*, § 1075, p. 378. Thus, "the court may not substitute its judgment on a question of fact for that of the jury, nor direct a verdict because the evidence decidedly preponderates for the moving party." 2B Barron & Holtzoff, *supra*, § 1075, at pp. 375–376. See Butte Cooper & Zinc Company v. Amerman, 157 F.2d 457 (9th Cir. 1946).

■ It is beyond peradventure to this court that plaintiff presented sufficient evidence to go to the jury. We reject outright defendants' contention that there was a mere scintilla of evidence.

■ Defendants assert that plaintiff's case was based solely on the testimony of Dr. Chadwick. However, there was ample circumstantial evidence from which liability could have been inferred, and from which a prima facie case could have been established even without Dr. Chadwick's testimony. See, e. g., Grey v. Hayes-Sammons Chemical Co., 310 F. 2d 291, 302 (5th Cir. 1962). Indeed, the jury was not bound by the defendants' evidence, nor forced to accept the testimony of their experts. American Cyanamid Co. v. Fields, 204 F.2d 151, 153 (4th Cir. 1953).

Appellants, however, challenged the testimony of Dr. Chadwick, who, on the basis of a detailed hypothetical,[2] testi-

2. The hypothetical question asked Dr. Chadwick was as follows:
"Q Doctor, now, I want you to assume these following facts to be correct and I'm going to ask your opinion based on these facts. First, I want you to assume that Max Alman and Buck Alman operate, who are the Plaintiffs here, a farm south of Brandon about one mile south of Brandon on Highway 18, and have operated this farm since the Spring of 1966, and have been there engaged in the business of raising hogs. I want you to further assume that in November and December, 1966, that they had an outbreak of cholera on this Alman farm and that the laboratory test in the State Department reflected that there was a hog cholera outbreak there, wherein no more than eleven hogs were lost, during this outbreak. I want you to further assume that there were no further disease symptoms of hog cholera as determined from December of 1966 up until July of 1967, and further assume that on June the 24th, 1967, the Alman Brothers began purchasing 494 hogs, and that during the immediate three week period, they purchased from various sources 494 hogs. Assume that it was impossible to determine at the time these hogs were being purchased, these 494 hogs, whether or not they had been vaccinated for hog cholera, but that none of the above 494 hogs purchased or delivered showed any of the symptoms of hog cholera, upon reaching the Alman Farm. Further, assume that on June the 24th, 1967, no hogs on the entire Alman Brothers property showed any of the external symptoms of hog cholera that you mentioned. Assume further, Doctor, that immediately upon

fied that in his opinion the vaccine Tissucine was the probable cause of the hog cholera and the death of plaintiff's 476 hogs. He also testified that modified live virus vaccine had on several prior occasions been cited as the cause of hog cholera outbreaks.

■ Defendants assert that the hypothetical question submitted to Dr. Chadwick contained assumptions not supported by the evidence and omitted certain material facts. Generally, the form and length of hypothetical questions are within the discretion of the trial judge. Dickerson v. Shephard Warner Elevator Co., 287 F.2d 255, 260 (6th Cir. 1961). "It is for the witness and not the court to determine whether from the facts stated he is able to express a scientific opinion. * * * A hypothetical question need not include all the facts in evidence, nor facts or theories advanced by opposing counsel." Metropolitan Life Insurance Co. v. Armstrong, 85 F.2d 187, 190 (8th Cir. 1936); 32 C.J.S. Evidence § 551(2), at p. 527 (1964). It is normally not required that each hypothetical question should embrace every fact which it might be contended should affect the

judgment of an expert witness. Dickerson v. Shephard Warner Elevator Co., *supra.* The question propounded to Dr. Chadwick fairly presented the plaintiff's theory of the case and was based upon assumptions which were supported by evidence.

■ Defendants have attempted to detract from this testimony by bringing out that Dr. Chadwick had discussed the legal connotation of the word "probable" with plaintiff's attorney. We find no indication of prejudicial influence, especially in light of Dr. Chadwick's eminent qualifications. He was Executive Officer and Secretary of the State Board of Sanitary Health in Mississippi—in essence, the "State Veterinarian," and as such he was a wholly disinterested and unpaid witness.

Defendants have also tried to establish that the cause of plaintiff's loss was a pre-exposure to a "field virus" prior to the vaccinations. However, the record indicates that plaintiff's hogs became ill 12 to 16 days after the vaccination, and defendants' own witnesses indicated that a pre-exposure would have indicated symptoms within 8 days. Defendants' attempts to blame other disease organ-

---

arrival at the farm, the said 494 hogs were immediately vaccinated with hog cholera vaccine known as Tissucine, manufactured by Diamond Laboratories, Incorporated and sold under the label of Southwestern Laboratories, Incorporated, a subsidiary of Diamond. Assume further, Doctor, that the vaccine had been properly stored and refrigerated and was administered at the Alman farm by Max Alman according to the instructions contained on the label and in the brochure of said vaccine, and assume further, that in addition to the vaccine the said hogs were given a standard hog cholera serum concentrate, also manufactured by Diamond, said serum concentrate also given in accordance with the manufacturer's instructions and directions, and assume further, that after the original group of hogs were vaccinated, thereafter on July 7th, 1967, these hogs began to show symptoms of hog cholera as you have stated and died within a few days thereafter, and, assume further, that

the remainder of the group of 494 hogs were vaccinated with a like amount of Tissucine hog cholera vaccine and hog cholera serum concentrate in accordance with the manufacturer's directions and that approximately at the same time after the vaccination the remainder of the 494 hogs so vaccinated showed symptoms of hog cholera as you have stated, and died, with the exception of 18 of said hogs, and assume further, that on or about July 10, 1967, 7 hogs from the said Alman Farm were brought to the Mississippi State Veterinary Diagnostic Laboratory and were tested for hog cholera, and that there was also found among said hogs a definite diagnosis of hog cholera, together with evidence of Salmonella, Septicemia, and gastroenteritis. Now, Doctor, assuming these facts to be true, I'll ask you whether or not you have an opinion of what disease or infirmity, if any, caused the death of the remaining 476 of the 494 hogs which died, do you have that opinion?"

isms in this case must also fail. The jury chose not to believe their experts' testimony and there was sufficient evidence for the verdict reached.

■ Another ground of error asserted by defendants is that the jury was misled by the admission of testimony concerning the highly suspect nature of modified live hog cholera vaccine and the strict regulations governing its sale and usage. Defendants' own counsel actually opened the door to this proof on cross-examination by establishing that Tissucine was on the United States Department of Agriculture's approved list of vaccines. The general standing of modified live cholera vaccines in the veterinary field was admissible to establish that defendants' product could have caused the cholera outbreak. See J. Wigmore, Evidence, § 455 at p. 457 (1940).

■ We add that defendants are not exonerated because their product met Department of Agriculture standards. A person can be guilty of negligence while acting within the bounds of the law. Cutshall v. State, 191 Miss. 764, 4 So.2d 289 (1941). The court below thus committed no prejudicial error in admitting the evidence about which defendants complain.

## II.

## PRODUCTS LIABILITY

In our discussion of defendants' defense in the area of products liability, we will first consider the assertion that plaintiff never established a prima facie case for failure to present proof of a defective or unreasonably dangerous product. Secondly, we will consider the question of the adequacy of the warning given by defendants.

Plaintiff's case was submitted to the jury with a charge paraphrasing § 402A of the Restatement of Torts, Second, which provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

This doctrine of strict liability has apparently been accepted in the State of Mississippi. State Stove Manufacturing Co. v. Hodges, 189 So.2d 113, 118 (Miss.1966). See Howard v. General Motors Corp., 287 F.Supp. 646, 648–649 (N.D.Miss.1968).

■ Defendants, in their attempt to establish that plaintiff failed to prove a "defective condition", relied principally upon three cases: McNamara v. American Motors Corp., 247 F.2d 445 (5th Cir. 1957); Smith v. General Motors Corp., 227 F.2d 210 (5th Cir. 1955); and Vandercook and Son, Inc. v. Thorpe, 322 F. 2d 638 (5th Cir. 1963).

In *McNamara*, the appellant was alleging that a misfunctioning steering column was causing the transmission to be in low gear when the indicator inside indicated that the car was in reverse. The appellant assumed that the driver, intending to back up, plunged forward into a river and to his death. The court, however, found that:

"If the matter happened as appellant assumes it did, it does not seem possible for the car, going forward into the river, to have flipped over on its top and ended up with its rear to the bank. The reverse would have been true. No explanation is offered,

nor do we think any could be, as to how or why, if the car had gone off head first, it could have landed in the river bottom side up with its rear to the bank."

In other words, his theory was practically beyond belief when viewed in the light of the physical facts. In the instant case, the physical evidence supports plaintiff's case.

In *Smith,* although the court agreed that the case should not have been submitted to the jury, it explained that:

> "While, as we have said, there is no absolute rule of law that forbids a jury from finding 'an inference on an inference,' here, however, the inference of the ultimate fact of causal negligence by the defendant, which plaintiff must prove to recover, *is dependent upon not one other inference but four or five."* 227 F.2d at 213 (emphasis added).

Here, plaintiff's case does not rest on such tenuous and remote conclusions. Juries are authorized to make reasonable inferences, even if some speculation is required. Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916 (1946); Equitable Life Assur. Society of United States v. Fry, 386 F.2d 239, 248 (5th Cir. 1967).

Finally, in *Vandercook, supra,* the plaintiff was injured while operating a power driven printing press which malfunctioned. We quote from defendants' brief at page 16 to understand the gist of their argument in the case *sub judice:*

> "In Vandercook and Son, Inc. v. Thorpe, 322 F.2d 638 (5th Cir. 1963) the plaintiff was injured when a press malfunctioned. It was stated at page 643 that:
>
> '[I]n viewing the plaintiff's proof in the most favorable aspect as we are required to do, we think it totally failed to pinpoint and establish the cause of the malfunction which produced the plaintiff's injury leaving its cause in the realm of mystery and speculation.'

> "Quoting further at page 644:
>
> 'We think the burden was on the plaintiff to show that there was something basically wrong with the design or construction * * * and that such a fault caused the malfunction. However plaintiff's proof did not identify the fault. We think the plaintiff was required to identify the cause of the failure of the machine in order to determine the issue of negligence. Mere evidence that the machine malfunctioned and caused the accident is not enough.'

> "The court was of the opinion that the directed verdict should have been granted.

> "The proof in the instant case is in the exact posture as the proof in *Vandercook.* Appellee has made no showing that 'Tissucine' was in any manner defective, nor offered any evidence as to how it could malfunction. The only proof offered is that 'Tissucine' probably caused the death of the hogs in question, and this is no evidence tending to establish why!"

Nevertheless, Judge John R. Brown, in his dissenting opinion, urged that:

> "The press failed to function many times by rolling back when it ought not to. Obviously the jury could find that a press should not do that. The jury could likewise conclude that this was not the result of improper maintenance or repair. A press which unaccountably rolls back without warning is not fit for the job for which it is intended. It was this characteristic which caused Plaintiff's injuries." 322 F.2d at 646–647.

We note with interest that on rehearing the court reversed and remanded on an implied warranty theory. Vandercook and Son, Inc. v. Thorpe, 344 F.2d 930 (5th Cir. 1965). On remand the United States District Court for the Middle District of Florida entered judgment for the employee, Thorpe, and another panel of this court affirmed, finding that the case was properly submitted to the jury.

Vandercook and Son, Inc. v. Thorpe, 395 F.2d 104 (5th Cir. 1968). On the question of defect, this court stated:

"A resolution of the question whether there was a defect in the press poses a more difficult problem. However, we find that the record contains evidence sufficient under the federal standard to create a jury question and to support the jury's verdict. The press was, at the time Thorpe was injured, only five and one-half months old. It had an expected useful life of fifteen to twenty years and was described by one of appellant's employees as a 'new machine.' The machine had not malfunctioned before it injured Thorpe, but was seen to malfunction at erratic intervals over a long period of time thereafter. * * * * * *

"Under the circumstances present here where the machine is potentially dangerous to life and limb because normal procedures require the operator to place his hand directly in the path of the cylinder, and the clutch mechanism which controls the cylinder's movements has a tight fit and will severely malfunction if some dust or dirt is present, we think a jury could properly draw a reasonable inference that the clutch was defective either mechanically or in design in that it was unreasonably dangerous for the operator to safely reach down to lift the paper from the press." 395 F.2d at 106, 107.

In light of this history of the *Vandercook* case, we are well convinced that the evidence in the instant case was properly submitted to the jury, and that there was a rational basis for the jury's inference that defendants' product was defective in some manner.

There apparently is a trend, both in federal courts and in the states, wherein it is no longer absolutely necessary for a plaintiff to prove a specific defect in a product causing him injury. For example, in Greco v. Bucciconi Engineering Co., 283 F.Supp. 978 (W.D.Pa.1967), aff'd, 407 F.2d 87 (3rd Cir. 1969), the plaintiff merely had to demonstrate that a steel piler's mechanical fingers dropped its load and caused him injury. Although other parts of the production line might have contained the causative defects, the piler manufacturer, having failed to establish that his machine did not contain the defective component, was held liable.

Other courts have also specifically rejected the idea that a plaintiff must specify the defect in a product in order to recover. In Davis v. Wyeth Laboratories, Inc., 399 F.2d 121, 128 (9th Cir. 1968), the court stated:

"At the outset we reject appellee's contention that the rule applies only where unreasonable danger results because of an ascertainable 'defect' or 'impurity' in the product, and that since this product was precisely what it was intended to be there was no such defect. The true test in a case of this kind is whether the product was unreasonably dangerous."

See also Bialek v. Pittsburgh Brewing Co., 430 Pa. 176, 242 A.2d 231 (1968); Ford Motor Company v. Cochran, 205 So.2d 551, 553 (Fla.Ct.App.1967).[3]

Defendants assert that even if Tissucine was an inherently dangerous product capable of causing cholera, its benefits far outweighed the risks. In essence, they rely on Comment *k* to § 402A of the Restatement, which provides:

"*K. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use.

3. Our research of Mississippi law showed no cases dealing with the specific problem of the requirements of proving an ascertainable defect. We have thus relied on both state and federal decisions, treatises, the restatements of law, etc., to determine what we think a Mississippi court would do. C. Wright, Federal Courts, § 58 at p. 240, 2d Ed. 1970.

These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this. very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

It is well recognized that to come within this exception an adequate warning and proper instructions must be given to a potential user of the product.

In Davis v. Wyeth Laboratories, Inc., *supra,* a case in which the manufacturer sold polio vaccine without warning of the statistical risk that one person in a million would contract polio by taking the vaccine, the court held that failure to warn of a known or fore-seeable idiosyncratic reaction made the vaccine "unfit" or "unreasonably dangerous" in the § 402A sense. 399 F.2d at pp. 126–130. Thus, the lack of an adequate warning in itself renders a product "defective". 2 Frumer and Friedman, Products Liability, § 16A[4] [e] (1967). See Basko v. Sterling Drug Co., Inc., 416 F.2d 417, 425–426 (2nd Cir. 1969).

In the case at bar, defendants' sole warning was that the product be administered only to "healthy" hogs. There apparently was compliance with this instruction. No attempt was made by defendants to give a complete disclosure of the existence and extent of the risk involved. Such obligation exists whether danger lies to human life or to property. Thibodaux v. McWane Cast Iron Pipe Co., 381 F.2d 491, 494 (5th Cir. 1967).

The judgment of the district court is affirmed.