939 F.2d 1293
 20 Fed.R.Serv.3d 692, Prod.Liab.Rep.(CCH)P 12,904
 Wilma LITTLE and Linda Carter, Mother and Next Friend of
Anidra Catrone Carter, Plaintiffs-Appellants,
v.
LIQUID AIR CORPORATION, Chevron Chemical Company and Victor
Manufacturing Company, Defendants-Appellees.
 No. 90-1807.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 3, 1991.
 
 Michael T. Lewis, Pauline S. Lewis, Lewis & Lewis, Clarksdale, Miss., Hollowell & Kelly, Greenville, Miss., for Little and Carter.
 John L. Low, IV, Watkins & Eager, Jackson, Miss., for Liquid Air.
 Frank W. Hunger, Marian S. Alexander, Lake, Tindall, Hunger & Thackston, Greenville, Miss., for Chevron.
 W. Swan Yerger, Gene D. Berry, Heidelberg, Woodliff & Franks, Jackson, Miss., for Victor Mfg.
 Appeals from the United States District Court for the Northern District of Mississippi.
 Before POLITZ, JOHNSON and GARWOOD, Circuit Judges.
 JOHNSON, Circuit Judge:
 
 
 1
 Summary judgment is a significant weapon in the arsenal of the district courts, insuring the efficient resolution of claims and defenses that lack genuine issues of material fact.[1] This procedural device, however, does not permit a district court to resolve factual issues that are properly left to a jury. The plaintiffs in the instant case sought recovery for the wrongful deaths of Marvin Joe Little ("Little") and Charles Carter ("Carter"), who were killed in a tragic gas explosion in the wingtank of a drydocked barge. The district court granted the defendant corporations' motions for summary judgment. Persuaded that summary judgment against the plaintiffs in this case was premature, this Court reverses the judgment of the district court and remands for further proceedings.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 2
 Propylene gas, which is sold under the name "Fuel Gas," spreads easily and poses a significant fire hazard. Between January 1987 and July 1988, defendant Chevron Chemical Co. ("Chevron") sold four bulk tank loads of propylene gas to the defendant Liquid Air Corp. ("Liquid Air"). At Liquid Air's request, Chevron odorized each of these bulk tank loads with ethyl mercaptan, a substance that gives propylene gas an odor similar to the smell of rotten eggs. Chevron furnished Liquid Air a Material Safety Data Sheet ("MSDS") that described the propensities of propylene, including its flammability and explosiveness. Among other warnings, the MSDS recited that, in the event of a propylene leak or spill, the area of the leak should be evacuated.
 
 
 3
 Liquid Air repackaged the propylene it acquired from Chevron and sold it to Mid-South Oxygen Company in Memphis, Tennessee. At the time of this sale, Liquid Air produced its own MSDS that was substantially similar to the MSDS it had received from Chevron. Mid-South Oxygen Company, in turn, sold the propylene container to a welding company, V & G Welding Supply, which resold the container to Mainstream Shipyards in Greenville, Mississippi. V & G Welding Supply supplied Mainstream Shipyards a copy of the Liquid Air MSDS.
 
 
 4
 On July 8, 1988, Marvin Joe Little and Charles Carter, employees of Mainstream Shipyards, Inc., entered the wingtank of a drydocked barge in Greenville, Mississippi, to make repairs with a cutting torch. Little and Carter were trained, experienced welders. In the wingtank--a watertight compartment below the decks of the barge--Little and Carter discovered a leak in a hose that connected their cutting torch to a container of propylene gas. They requested that a third member of their work detail, Ernest Hughes ("Hughes"), remove the hose and repair the leak. Hughes pulled the cutting torch and the attached hose out of the wingtank.
 
 
 5
 While Hughes performed the necessary repairs, Little and Carter remained in the wingtank. After a short period of time, the welders could no longer detect the pungent odor that had alerted them to the presence of odorized propylene gas in the air. Carter, assuming that the gas had dissipated, apparently lit a cigarette. The flame ignited the propylene gas in the air. The subsequent explosion blasted Little through a manhole to the deck of the barge, killing him instantly. Carter was severely burned in the explosion and died five days later in a local hospital.
 
 
 6
 On December 1, 1988, plaintiff Wilma Little filed an original complaint in federal court seeking recovery for the wrongful death of her husband. Plaintiff Linda Carter filed her own original complaint on July 11, 1989. The district court later consolidated the two lawsuits. Both complaints alleged that the defendants Chevron and Liquid Air had failed to warn the respective purchasers of propylene that "nasal fatigue" would affect the continued ability of exposed individuals to smell the gas. In addition, the complaints alleged that the defendant Victor Equipment Co. ("Victor"), manufacturer of the cutting torch that Little and Carter used in the wingtank, had created the dangerous condition that caused the fatal gas leak.
 
 
 7
 A magistrate judge set January 26, 1990, as the discovery deadline in the cases. The district court, however, permitted limited discovery until June 15, 1990. On June 18, three days later, Chevron filed a motion for summary judgment. Another week later, the plaintiffs filed a motion to amend their complaints to allege that the ethyl mercaptan had oxidized and did not emit a scent that would have alerted Little and Carter to the presence of a flammable gas. All of the defendants filed responses to the plaintiffs' motion to amend, and Liquid Air and Victor filed their own motions for summary judgment.
 
 
 8
 The magistrate judge denied the plaintiffs' motion to amend their complaints. On September 13, 1990, the district court affirmed the magistrate judge's denial of the motion to amend and, in a separate order, granted all of the defendants' motions for summary judgment.
 
 II. DISCUSSION
 
 9
 On appeal, the plaintiffs raise essentially two arguments. First, they complain that the district court should not have refused to grant their motion to amend their pleadings. Second, they complain that the district court should not have granted the defendants' motions for summary judgment. We address each of these arguments in turn.
 
 A. Motion to Amend
 
 10
 The Federal Rules of Civil Procedure provide that leave to amend pleadings "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Leave to amend, however, is by no means automatic. Addington v. Farmer's Elevator Mut. Ins. Co., 650 F.2d 663, 667 (5th Cir.1981); Layfield v. Bill Heard Chevrolet Co., 607 F.2d 1097, 1099 (5th Cir.1979), cert. denied, 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980). Accordingly, the decision to grant or deny leave to amend lies within the sound discretion of the district court. Guthrie v. J.C. Penney Co., 803 F.2d 202, 210 (5th Cir.1986); Jamieson By and Through Jamieson v. Shaw, 772 F.2d 1205, 1208 (5th Cir.1985). In exercising its discretion, the district court may consider a variety of factors:
 
 
 11
 undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.
 
 
 12
 Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).
 
 
 13
 In their motions to amend, the plaintiffs attempted to replace their original contention that Carter lit a cigarette because he could no longer smell the presence of propylene gas in the air with a contention that Carter and Little were never aware of the presence of propylene because the odorizing agent had oxidized. If permitted, this amendment would have radically altered the nature of a trial on the merits: the defendants, rather than defend against a complaint that they had failed to warn about "nasal fatigue," would have had to defend against a complaint that the odorizing agent was defective. The amendment that the plaintiffs requested was not merely clerical or corrective. It would have established an entirely new factual basis for the plaintiffs' claims and, consequently, would have required that the parties reopen discovery and alter their trial strategies. "While leave to amend must be freely given, that generous standard is tempered by the necessary power of a district court to manage a case." Shivangi v. Dean Witter Reynolds, Inc., 825 F.2d 885, 890 (5th Cir.1987). The district court reasoned, with no little justification, that it could not effectively manage this case unless it denied the plaintiffs' motion to amend.
 
 
 14
 The tardiness of the plaintiffs' motion to amend undoubtedly affected the district court's decision to deny the motion. An amendment that a party raises late in the pre-trial life of a lawsuit has a significant tendency to disrupt trial proceedings. Therefore, this Court has determined that if the delay in filing a motion for leave to amend is particularly egregious, the burden shifts to the moving party to demonstrate that the delay was "due to oversight, inadvertence or excusable neglect." Gregory v. Mitchell, 634 F.2d 199, 203 (5th Cir.1981). There is little question that the delay in this case was particularly egregious. First, the plaintiffs did not propose their amendment until well over a year after they had instituted their actions and several months after discovery on the actions had effectively terminated. Second, by the time the plaintiffs proposed their amendment, Chevron had already moved for summary judgment.[2] Despite the apparent delay, however, the plaintiffs did not attempt to satisfy their burden: they offered no evidence that their delay in filing the motions for leave to amend was excusable or a result of mere oversight.
 
 
 15
 This Court is unable to conclude that the district court's denial of the plaintiffs' motion was an abuse of discretion. At the late date that the plaintiffs filed their motion for leave to amend, the district court reasonably could have concluded that the interests of fairness and justice were best served by avoiding the additional discovery and trial litigation that the new factual allegations would entail.[3]
 
 B. Summary Judgment
 
 16
 In determining whether a district court properly granted summary judgment, this Court must review the record under the same standards that guided the district court. Walker v. Sears, Roebuck & Co., 853 F.2d 355, 358 (5th Cir.1988). Accordingly, we cannot affirm a summary judgment unless we conclude, after an independent review of the record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We must review the evidence, as well as the inferences that may be drawn from the evidence, in the light most favorable to the party that opposed the motion for summary judgment. Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc., 804 F.2d 879, 881 (5th Cir.1986) (per curiam); Reid v. State Farm Mut. Auto. Ins. Co., 784 F.2d 577, 578 (5th Cir.1986).
 
 
 17
 At the summary judgment stage of trial proceedings, the role of the judge is not to weigh the evidence and determine the truth of the allegations in question, but rather to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986). If there is sufficient relevant evidence which, under the applicable substantive law, would enable a reasonable jury to return a verdict in favor of the party opposing summary judgment, then a genuine issue of material fact exists. Id. The existence of a genuine issue of material fact precludes summary judgment. Fed.R.Civ.P. 56(c).
 
 
 18
 The party that moves for summary judgment bears the burden to establish that its opponent has failed to raise a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To satisfy this burden, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense. Id. See also Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 178 (5th Cir.1990). If the movant satisfies this burden, the burden shifts to the nonmovant to demonstrate that summary judgment is inappropriate. Lavespere, 910 F.2d at 178.
 
 
 19
 In the instant case, however, this Court is persuaded that the burden did not shift to the plaintiffs because the defendants failed to discharge their burden to establish that the plaintiffs did not raise a genuine issue of material fact. The crucial issue in this case is whether the defendants adequately warned the decedents' employer, Mainstream Shipyards, that nasal fatigue can affect an individual's ability to detect the presence of propylene gas. Summary judgment is rarely appropriate in negligence and products liability cases, even if the material facts are not in dispute. Trevino v. Yamaha Motor Corp., U.S.A., 882 F.2d 182, 184 (5th Cir.1989); Miller-Schmidt v. Gastech, Inc., 864 F.2d 1181, 1185 (5th Cir.1989); Davidson v. Stanadyne, Inc., 718 F.2d 1334, 1338 (5th Cir.1983). An inherently normative issue, such as whether a manufacturer has adequately warned a user that its product is hazardous, is not generally susceptible to summary judgment: the evidence requires that a jury balance the breadth and force of the warning that the manufacturer provided--if it even did so--against the nature and extent of the risk. See Fontenot v. Upjohn Co., 780 F.2d 1190, 1196 (5th Cir.1986).
 
 
 20
 This Court has recognized two circumstances in which summary judgment might appropriately dispose of a negligence or products liability action: (1) the resolution of the summary judgment motion turns upon legal issues, and not factual issues, Trevino, 882 F.2d at 184; and (2) the evidence was insufficient to create a genuine issue of material fact concerning the defendant's alleged failure to comply with a normative standard. Lavespere, 910 F.2d at 178-79. Neither of these circumstances are evident here.
 
 1. Adequacy of the Warnings
 
 21
 In State Stove Mfg. Co. v. Hodges, 189 So.2d 113 (Miss.1966), cert. denied, 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784 (1967), the Mississippi Supreme Court adopted Restatement (Second) of Torts section 402A,[4] which authorizes an action in strict liability against the manufacturer of a defective product. The supreme court ruled that if a defective product, which causes injury to the plaintiff, "left the defendant's control in a dangerously unsafe condition, or was not reasonably safe, or was unsafe for its intended use, the defendant is liable whether or not he was at fault in creating that condition, or in failing to discover and eliminate it." Id. at 121.
 
 
 22
 Comment k to section 402A provides that certain unavoidably unsafe products, including volatile gases, are not "unreasonably dangerous" if the manufacturer or distributor furnishes the user an adequate warning of the hazards of the product.[5] See Pridgett v. Jackson Iron & Metal Co., 253 So.2d 837, 843-44 (Miss.1971). Because the principal purpose of the warning is to permit the user to make an informed decision whether to expose himself to the risks of the product, however, a manufacturer or distributor "fulfills its duty to warn in this context only if it warns of all dangers associated with its products of which it has actual or constructive knowledge." Jackson v. Johns-Mansville Sales Corp., 750 F.2d 1314, 1320 (5th Cir.1985) (en banc) (emphasis added), cert. denied, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986).
 
 
 23
 Chevron and Liquid Air concede that they did not inform Little and Carter, through their employer,[6] that propylene gas causes nasal fatigue which can reduce the ability to detect the presence of the gas. However, Chevron and Liquid Air maintain that they are not liable to the decedents' survivors because they warned Mainstream Shipyards that, in the event of a leak or spill, the area surrounding the leak should be evacuated. The defendants argue, in essence, that they delivered an adequate warning which, if followed, would have prevented the deaths of Little and Carter.
 
 
 24
 The warning that Chevron and Liquid Air provided in their respective MSDSs may possibly have been adequate, but the jury should have been the arbiter of this question. Consider the following explanation of the decedents' actions: Little and Carter discover the propylene gas leak and request that the cutting torch and its attached hose be removed from the wingtank; after the cutting torch and attached hose are removed, Little and Carter cannot smell anything that would indicate the presence of propylene gas; they assume that the ventilator fan in the wingtank has dissipated the gas; rather than follow the leaky cutting torch hose from the wingtank (and consequently remain in the vicinity of the propylene leak), Little and Carter elect to remain temporarily in the wingtank; as they attempt finally to leave the wingtank, the propylene explodes. On examination of the available evidence, this account of the events of the tragic explosion is at least a possible version of the facts, even if not the most likely version. Under this version, the decedents would have attempted to follow the spirit of the defendants' warning that personnel should avoid the immediate area of a propylene leak, and yet would have died because they were not warned that nasal fatigue can affect their ability to detect the presence of propylene. The jury, and not the district judge, should determine the truth of this version of the facts.[7]
 
 
 25
 The instant case is not unlike Alman Bros. Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc., 437 F.2d 1295 (5th Cir.1971). The plaintiffs in Alman Bros. filed a products liability action against the manufacturer of an animal vaccine which, when administered to the plaintiffs' 494 hogs, allegedly killed 476 of them. The manufacturer responded that it had warned the plaintiffs that they should administer the vaccine only to "healthy" hogs and that, if the plaintiffs had followed this warning, the hogs would not have died. The Fifth Circuit, interpreting Mississippi law, concluded that the manufacturer's warning was inadequate because it did not completely disclose "the existence and extent of the risk involved." Id. at 1303.
 
 
 26
 A similar result ensues here. It is conceivable that the decedents' attempts to follow the spirit of the meager Chevron and Liquid Air warnings aggravated the danger to which they were exposed because the defendants did not completely disclose "the existence and extent of the risk involved." The evidence in the instant case was sufficient to raise a genuine issue of material fact whether Chevron and Liquid Air adequately warned Mainstream Shipyards that propylene gas is dangerous. A jury should determine whether the defendants' failure to warn that propylene can cause nasal fatigue was a breach of their duty to warn of all dangers of which they had actual or constructive knowledge.[8] The district court erred in granting summary judgment in favor of Chevron and Liquid Air.
 
 
 27
 2. Bulk Seller/Sophisticated Purchaser Defense
 
 
 28
 As a defense in "failure to warn" products liability actions, the Mississippi Supreme Court has adopted the "learned intermediary" doctrine. Wyeth Laboratories, Inc. v. Fortenberry, 530 So.2d 688 (Miss.1988). The learned intermediary doctrine, in its Mississippi application, provides that a manufacturer of pharmaceuticals is not required to warn an ultimate user of the propensities and dangers of the use of a drug, but instead may rely upon an intermediary--the prescribing physician--to inform her patient of these propensities and dangers.
 
 
 29
 Reasoning that Wyeth Laboratories signalled the Mississippi Supreme Court's intention to expand the available defenses in a failure to warn action, the district court ruled that Mississippi's highest court would adopt the "bulk seller" doctrine and that this doctrine shielded Chevron from liability to the plaintiffs.[9] This doctrine provides that a bulk seller--one who sells a product to another manufacturer or distributor which in turn packages and sells the product to the public--is required only to warn the intermediate distributor, and not each individual consumer, that the product is dangerous. Jones v. Hittle Service, Inc., 219 Kan. 627, 549 P.2d 1383 (1976).
 
 
 30
 An underlying assumption of the bulk seller doctrine is that the bulk seller may rely on an informed distributor to pass information concerning the dangers of the product to the consumer. Under the bulk seller doctrine, however, the bulk seller's reliance upon the intermediate distributor must be reasonable. The bulk seller, therefore, fulfills its duty to the ultimate consumer only if it ascertains (1) that the distributor to which it sells is adequately trained, (2) that the distributor is familiar with the properties of the product and the safe methods of handling it, and (3) that the distributor is capable of passing this knowledge to the consumer. Jones, 549 P.2d at 1394.
 
 
 31
 While the district court is perhaps correct that Mississippi would adopt the bulk seller doctrine, the court did not properly conclude that the doctrine requires summary judgment in Chevron's favor. The bulk seller doctrine is, after all, an affirmative defense. At trial, Chevron would bear the ultimate burden of proof on the elements of the bulk seller defense. For summary judgment to be appropriate, therefore, Chevron must demonstrate that the evidence in the record so conclusively establishes each element of the bulk seller doctrine that there is no genuine issue of material fact. Lavespere, 910 F.2d at 178-79. Chevron has not satisfied this requirement. There is a genuine issue of material fact whether Chevron fulfilled its obligation to ascertain that Liquid Air, the distributor to which it sold the propylene, was adequately trained and familiar with the properties of the gas.
 
 
 32
 The only evidence that the district court cited to support its conclusion that Chevron fulfilled its obligations under the bulk seller doctrine was the Chevron MSDS. This document, however, did not insure that Liquid Air was adequately trained to handle propylene gas. Moreover, the MSDS did not provide Liquid Air information concerning all the critical qualities of propylene; for instance, Liquid Air officials admitted that they were unaware of the propensity of propylene to cause nasal fatigue. Because there is a genuine issue of material fact whether Chevron's reliance on Liquid Air was reasonable, the district court improperly granted summary judgment in Chevron's favor on the basis of the bulk seller doctrine.
 
 
 33
 A second doctrine which Chevron advances as a defense is the "sophisticated user" doctrine. This doctrine, which the district court unfortunately confuses with the bulk seller doctrine, provides that a manufacturer or distributor of a product is not liable for a failure to warn the user of a particular danger that the user knows or reasonably may be expected to know exists. Grady v. American Optical Corp., 702 S.W.2d 911, 915 (Mo.Ct.App.1985). In the instant case, the ultimate users of the product in question--Little and Carter--at least arguably were not sophisticated. There is sufficient evidence that the decedents did not fully appreciate the dangers of propylene because they were not adequately warned. Accordingly, even if the Mississippi Supreme Court adopted the sophisticated user doctrine, the applicability of the doctrine in the instant case is a jury question.
 
 
 34
 Chevron proposes that this Court conclude that Mississippi would fuse the sophisticated user doctrine and bulk seller doctrine. It claims that the district court properly excused Chevron from liability to the plaintiffs because Liquid Air should have known and been able to warn the decedents that propylene gas caused nasal fatigue. Chevron offers no authority, however, to support its proposed fusion of these two disparate doctrines. On the contrary, in Donahue v. Phillips Petroleum Co., 866 F.2d 1008 (8th Cir.1989), the Eighth Circuit already has rejected a similar proposal under Missouri law, reasoning that the fusion of the sophisticated user and bulk seller doctrines would undercut traditional strict liability analysis. Id. at 1012-13. We find that the same conclusion applies to Mississippi law. The Mississippi law of products liability does not authorize the fusion of the sophisticated user and bulk seller doctrines and, consequently, does not support the summary judgment that the district court granted in Chevron's favor.
 
 3. Superseding Cause
 
 35
 Victor argues that the proximate cause of the deaths of Little and Carter was their failure to leave the wingtank after discovery of a gas leak they knew to be dangerous. As previously noted, however, there is at least some evidence that the decedents' failure to leave the wingtank was not negligent, and instead was a reasonable attempt to accommodate instructions that they should avoid the vicinity of a propylene gas leak. If this conclusion is true, then the defect in the Victor cutting torch is perhaps the proximate cause of the deaths of Little and Carter.[10] Again, there is at least enough here for the jury to decide. See Davidson, 718 F.2d at 1338.
 
 III. CONCLUSION
 
 36
 Summary judgment is an inappropriate device to resolve most strict liability and negligence cases. The instant case is no exception to the general rule. The judgment of the district court is affirmed in part, reversed in part and remanded.
 
 
 37
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 GARWOOD, Circuit Judge, dissenting:
 
 38
 I respectfully dissent.
 
 
 39
 I agree with the district court that plaintiffs failed to discharge their burden of coming forward with summary judgment evidence sufficient to permit a finding that the claimed defect in the warnings was a cause of the injury, an issue on which they would have the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The asserted warning deficiency is the failure to mention the possibility of "nasal fatigue." But here it is plain that Carter and Little smelled the gas, knew it was present in the hold, and very shortly thereafter the explosion occurred.[1] On this record, it is the purest speculation to simply assume that Carter and Little, who had assertedly just smelled the gas, were suddenly afflicted with "nasal fatigue" and so could no longer smell it.
 
 
 40
 But, even if this were so, the Chevron warnings were sufficient, if followed, in that situation, for they expressly advised: "if Material is Released or Spilled: Eliminate all sources of ignition in vicinity of spill or released vapor. Evacuate the area immediately and do not allow anyone to return until it is safe to do so." Obviously, if the cigarette scenario is accepted, the warning to eliminate "all sources of ignition" in the "vicinity of" the released gas was not heeded.[2] And if, as the majority hypothesizes, Carter and Little delayed their departure for some time, then they clearly did not heed the warning to "evacuate the area immediately." Moreover, Carter and Little--whom the majority recognizes were "trained, experienced welders"--were in a fourteen-foot deep barge hold that was fully enclosed except for the single hatch at the top. Under the heading "unusual fire and explosion hazards" the Liquid Air warnings stated that "propylene is heavier than air and may travel a considerable distance to a source of ignition.... Highly flammable vapors which are heavier than air may accumulate in low areas and/or spread along ground away from handling site."[3] As applied to Carter and Little, the warnings cannot reasonably be construed as containing some implied exception permitting them to assume they could safely remain in the enclosed fourteen-foot deep hold and conduct themselves as if it were gas-free simply because they no longer smelled the gas they had detected there only moments before.
 
 
 41
 I add some observations respecting Chevron's alternative defense that it, as a bulk seller, adequately warned Liquid Air, the intermediate distributor to whom it sold the propylene. See, e.g., Mason v. Texaco, Inc., 862 F.2d 242, 246-47 (10th Cir.1988); Purvis v. PPG Industries, Inc., 502 So.2d 714, 722 (Ala.1987); Munoz v. Gulf Oil Co., 732 S.W.2d 62, 66 (Tex.App.Houston, 14th, 1987, n.r.e.). The adequacy of warnings to users is usually determined by the user's level of sophistication. See, e.g., Martinez v. Dixie Carriers, Inc., 529 F.2d 457, 465-66 (5th Cir.1976); American Mutual Liability v. Firestone Tire & Rubber Co., 799 F.2d 993 (5th Cir.1986); Koonce v. Quaker Safety Products & Mfg., 798 F.2d 700, 719 (5th Cir.1986) (no duty to warn one "who may reasonably be assumed to have knowledge of the dangers involved" and "manufacturer may rely on a product user's special expertise or knowledge"). I see no reason to gauge the adequacy of Chevron's warning to Liquid Air under any other standard. I disagree with the majority in Donahue v. Phillips Petroleum, 866 F.2d 1008, 1013 (8th Cir.1989), that such an approach is improper because it "effectively would undercut ... strict liability." That reasoning ignores the general rule that failure to warn is in any event essentially a negligence concept. See, e.g., Prosser and Keeton on Torts (5th ed. 1984) Sec. 99 at 697.[4] There is no reasonably feasible way in which a seller in bulk such as Chevron can warn anyone other than its purchaser. Accordingly, just as in the case of user directed warnings, a bulk seller should be under no duty to warn its purchaser of dangers the purchaser may reasonably be assumed to have knowledge of, and the bulk seller should be able to rely on the purchaser's special expertise or knowledge. Here, however, there was essentially unrebutted summary judgment evidence tending to indicate that "nasal fatigue" was something that even an established distributor such as Liquid Air could not reasonably be assumed to know of.[5] Consequently, I agree with the majority that, on the present record, in this respect "there is a genuine issue of material fact whether Chevron's reliance on Liquid Air was reasonable."
 
 
 
 [1]
 See Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' ")
 
 
 [2]
 This Court has previously emphasized that the fact that a defendant has filed a motion for summary judgment is significant in the determination whether a plaintiff's subsequent motion to amend is timely. See Shivangi v. Dean Witter Reynolds, Inc., 825 F.2d 885, 890 (5th Cir.1987); Addington v. Farmer's Elevator Mut. Ins. Co., 650 F.2d 663, 667 (5th Cir.1981). "Much of the value of summary judgment procedure ... would be dissipated if a party were free to rely on one theory in an attempt to defeat a motion for summary judgment and then, should that theory prove unsound, come back long thereafter and fight on the basis of some other theory." Freeman v. Continental Gin Co., 381 F.2d 459, 469-70 (5th Cir.1967)
 The Court's opinion in Zaidi v. Ehrlich, 732 F.2d 1218 (5th Cir.1984), is not to the contrary. In Zaidi, this Court reasoned that a pending motion for summary judgment does not in itself extinguish a plaintiff's right to amend a complaint. Id. at 1220. The Court did not hold that the existence of a motion for summary judgment cannot be a factor in the determination whether a subsequent motion to amend is timely.
 
 
 [3]
 We conclude merely that the district court did not abuse its discretion, at the time it entered its decision, in denying the plaintiffs' motion to amend. Our conclusion does not prevent the plaintiffs from reasserting their motion on remand. We express no opinion whether the district court would abuse its discretion in again denying the motion to amend
 
 
 [4]
 Restatement (Second) of Torts Sec. 402A provides:
 Sec. 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in Subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
 
 
 [5]
 Restatement (Second) of Torts Sec. 402A comment k provides in pertinent part:
 k. Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous.... The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.
 
 
 [6]
 It is clear under Mississippi law that Liquid Air was required only to deliver adequate warnings to Mainstream Shipyards. Any warnings given to an employer are imputed to its employees. Pridgett, 253 So.2d at 843-44
 
 
 [7]
 The dissenting opinion concludes that this version of the facts is nothing more than the "purest speculation." Opinion at 1303. Before trial, however, any interpretation of the events that give rise to a lawsuit is nothing more than speculation. The very function of a jury is to determine the truth among several speculative versions of the facts. The court may not grant summary judgment simply because one party's version of the facts is speculative. Rather, the court may only grant summary judgment if "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). In the instant case, the evidence that favors the plaintiffs is admittedly weak. Nonetheless, after viewing the evidence in the light most favorable to the plaintiffs, this Court concludes that the evidence is sufficient to enable a jury to return a verdict in the plaintiffs' favor
 
 
 [8]
 Liquid Air's reliance on the case of City of Jackson v. Ball, 562 So.2d 1267 (Miss.1990), is misplaced. Ball states nothing more than the well recognized proposition that a manufacturer or distributor is not required to inform a user of facts which the user already knows. Id. at 1270 ("The rule we glean from the cases is that the dangerous product user need give no further warning after the contractor ... has actual knowledge of the danger."). Here, Little and Carter did not have actual knowledge of the danger that propylene might cause nasal fatigue
 
 
 [9]
 The conclusion that the Mississippi Supreme Court would adopt the bulk seller doctrine seems intuitively correct. A number of states have already done so. See, e.g., Jones v. Hittle Service, Inc., 219 Kan. 627, 549 P.2d 1383 (1976); Morris v. Shell Oil Co., 467 S.W.2d 39, 42 (Mo.1971)
 
 
 [10]
 It should be noted that Carter's lighting of a cigarette might be negligence, and therefore a superseding cause of his death. However, this would not affect Little's claim
 
 
 [1]
 The plaintiffs' complaints, as last amended with permission of the district court, each allege:
 "The hold [where Carter and Little were working] was an enclosed area below the decks of the barge.... Except for a single hatch, there was no ingress or egress to this hold. Carter and Little discovered a gas leak and decided to remove the torch from the hold to repair the hose. A short time after the hose was removed, no longer smelling the gas and believing the area to be safe, Carter lit a cigarette."
 The tendered, but refused, amended complaints allege:
 "The hold was an enclosed area below the decks of the barge.... Except for a single hatch, there was no ingress or egress to this hold. Carter and Little discovered a gas leak. Unaware that the propylene had reached its flammability limits, Carter and Little removed the torch from the hold to repair the hose. Almost immediately after the hose was removed, as Carter and Little were attempting to leave the hold, the gaseous propylene mixture exploded."
 Plaintiffs assert that the summary judgment evidence shows "Little was last seen [just prior to the explosion] on the 14 foot ladder to the hatchway, from two to five feet below the hatch."
 
 
 [2]
 These warnings also stated: "Do not use or store near flame, sparks or hot surfaces. Use only in well ventilated area." They advised that propylene gas evaporates and "forms vapor (fumes) that can catch fire and burn with explosive violence. Invisible vapor spreads easily and can be set afire by many sources." The only thing they said about smell is that propylene gas is a "colorless, practically odorless gas."
 The Liquid Air warnings, under the heading "Steps to be taken in case material is released or spilled," stated "evacuate all personnel from affected area.... Protect from ignition. Ventilate area thoroughly." The Liquid Air warnings further advised "Post 'No Smoking or Open Flames' signs in the storage or use area. There should be no source of ignition in the storage or use area." These warnings stated that propylene is a "colorless gas with a mild olefinic sour odor," but did not otherwise make any mention of smell or odor.
 
 
 [3]
 These warnings also advised that "propylene is flammable over a wide range in air. It can also form explosive mixtures in air."
 
 
 [4]
 This authority states:
 "It is commonly said that a product can be defective in the kind of way that makes it unreasonably dangerous by failing to warn or failing adequately to warn about a risk or hazard related to the way a product is designed. But notwithstanding what a few courts have said, a claimant who seeks recovery on this basis must, according to the generally accepted view, prove that the manufacturer-designer was negligent. There will be no liability without a showing that the defendant designer knew or should have known in the exercise of ordinary care of the risk or hazard about which he failed to warn. Moreover, there will be no liability unless manufacturer failed to take the precautions that a reasonable person would take in presenting the product to the public. Although this ground of recovery is sometimes referred to as strict liability, it is really nothing more than a ground of negligence liability...." Id. (footnote omitted).
 
 
 [5]
 For example, none of Liquid Air's directors, management, or officers had heard of "nasal fatigue" or anything like it, and this was likewise the case with the head of its engineering technical services section, responsible for gathering and maintaining knowledge of the technical aspects of propylene, who had been in the industry for over thirty years